[Civ. No. 38646. First Dist., Div. One. Jan. 3, 1978.]

DONALD F. ELDRIDGE et al., Plaintiffs,
Cross-defendants and Appellants, v.
ALYCE LEE BURNS et al., Defendants,
Cross-complainants and Respondents.

## COUNSEL

Cliff & Nowinski, Peter A. Nowinski, Frank B. Cliff and William A. Jeffers for Plaintiffs, Cross-defendants and Appellants.

Crift, Crist, Griffiths, Bryant, Schulz & Biorn, Frank Lee Crist, Jr., and Chilton H. Lee for Defendants, Cross-complainants and Respondents.

OPINION

**SIMS, J.**—Plaintiff, Donald F. Eldridge, the purchaser of some 750 acres of land, and Marian T. Eldridge, his wife, have appealed from an adverse judgment in an action in which they sought a decree compelling the defendants, Alyce Lee Burns (the seller of the property and payee of a note secured by a deed of trust, for the balance of the purchase price), Emmett Burns (her husband who filed a disclaimer in the case), the trustee under the deed of trust, and a bank holding a collateral assignment of the purchase money note, to convey to the purchaser a portion of the land under provisions of the deed of the trust which allegedly gave the purchaser the right to a release and partial reconveyance for payments on the purchase price he had made. The plaintiffs also sought to enjoin a threatened foreclosure against the whole of the property that had been subjected to the lien of the deed of trust.

The question of the appealability of the judgment denying the plaintiffs relief has been raised by the parties and determined adversely to the defendants. On the merits the plaintiffs contend that the trial court erred in failing to award them specific performance of a release of property selected and described in literal compliance with the release clause contained in the deed of trust given for the unpaid balance of the purchase price of the property; that it erred in determining that the buyer was not entitled to demand a release of the property because he was in default in the payment of taxes and assessments, and subsequently after demand, defaulted in the payment of principal and interest; that it erred in concluding that the release as demanded was unfair; and that it erred in refusing to grant the buyer alternative relief. The seller defends the action of the lower court and insists on her right to the property free and clear of any obligation under the release clause.

On review it is determined that the right to release of the property was not forfeited by the subsequent default of the buyer; that the clause on its face was sufficiently certain to give rise to an obligation to release property; that, because of supervening equitable doctrines protecting the rights of the seller-lender, the demand of the buyer under the clause could not be specifically enforced; and that the trial court erred in not recognizing that the buyer was entitled to some equitable relief to prevent a forfeiture and undue enrichment of the seller, and in failing to enjoin a sale of the whole property without so providing. The judgment must be reversed.

## I

Preliminarily it is necessary to determine whether an appeal may be entertained from the judgment in this case, which is entitled "Interlocutory Judgment."[1] By their complaint the plaintiffs sought (1) to quiet title to property that had been selected under the terms of a deed of trust for partial reconveyance, (2) a declaration that such property had been redeemed free and clear of all liens and encumbrances, (3) a decree compelling such partial reconveyance, (4) forfeiture of the $300 statutory penalty under section 2941 of the Civil Code and consequential damages because of the beneficiary's and trustee's failure to so reconvey, (5) and (6) interlocutory and final decrees prohibiting a sale of the property so claimed under the deed of trust, (7) restitution of sums advanced for the protection of the defendants' security interest in the property, (8) reasonable attorney's fees, (9) costs of suit and (10) such other relief as might be proper. The judgment expressly denied plaintiffs all and any relief.[2]

By their amended answer and an amendment thereto the defendant Burns and the trustee under the deed of trust alleged that the release clause was invalid, and prayed for attorney's fees and costs. A separate

---

[1]The judgment expressly recites: "7. This is an interlocutory judgment and the court retains jurisdiction to resolve disputes between the plaintiffs and defendant up until the time of the sale under the power of sale contained in said deed of trust, and for the further purpose of determining attorney fees incurred by defendant together with any issues involving assessments and other matters which may arise between the parties" and "10. Defendant is entitled to reasonable attorney fees and costs in connection with trial of this matter and in connection with the foreclosure of the subject property, in an amount to be determined upon appropriate motion by the defendant before the above entitled court."

[2]The judgment recites: "1. That Plaintiffs are not entitled to enjoin the sale of the 600 acres of land encumbered by the deed of trust securing the promissory note the subject of this action, under the power of sale contained in said deed of trust, and the preliminary injunction restraining such sale is hereby dissolved. [¶] 2. That Plaintiffs' request for quiet title, declaratory relief, specific performance of an unconditional right to release a lien of the deed of trust, for statutory penalty for violation of Civil Code Section 2941 and consequential damages, and for attorney fees is hereby denied. [¶] 3. Plaintiffs are not entitled to a stay of execution preventing the Defendant from proceeding to sell the property under the power of sale contained in the deed of trust on the subject property. [¶] 4. That Plaintiffs are denied restitution, without diminishing the generality of the foregoing, of any sum, including monies paid towards the purchase price, together with interest thereon, attorney fees in connection with this lawsuit or in connection with the lawsuit involving the City of Palo Alto. [¶] 5. That Plaintiffs shall not be entitled to request an alternative release of acreage as such relief would be inequitable to the Defendant and that, further, Plaintiffs' actions heretofore amount to laches. [¶] 6. That Defendant is authorized to proceed with sale of the 600 acres secured by his deed of trust, under the power of sale contained in said deed of trust."

cross-complaint was filed by those defendants for foreclosure, for a deficiency judgment and for waste. At the trial following the taking of evidence, but before submission of the case, the defendants dismissed their cross-complaint with prejudice. The court so found and adjudged, and also ruled that no attorney's fees were payable to defendants by virtue of that pleading.

The court having found that the plaintiffs were not entitled to enjoin the exercise of the power of sale under the deed of trust further found: "19. The court finds that there may be other issues relating to this matter which may arise prior to the foreclosure sale, including attorneys fees, questions regarding the assessments and other matters, and, therefore, the court finds that it would be equitable to retain jurisdiction in the event an issue or dispute arises between the parties and to further determine attorneys fees at the expiration of the foreclosure sale. [¶] 20. The court finds that the defendants have incurred substantial fees in connection with this action and reserves the right to award defendant said fees at a more meaningful time after foreclosure has taken place." and "[¶] 22. The court finds that defendant is entitled to reasonable attorney fees and costs in connection with trial of this matter and in connection with the foreclosure of the subject property, in an amount to be determined upon appropriate motion by the defendant before the above entitled court." It concluded, "13. That the court shall retain jurisdiction in the form of an interlocutory judgment for the purposes of retaining jurisdiction to resolve disputes between the plaintiff and defendant up until the time of the foreclosure sale, and for the further purpose of determining attorney fees incurred by defendant together with any issues involving assessments and other matters which may arise between the parties."

■ "Unless expressly authorized by law an appeal does not lie from an interlocutory judgment. [Citation.] The reason is the 'one final judgment' rule, ' "a fundamental principle of appellate practice in the United States. The theory is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await final disposition of the case." ' (*Efron* v. *Kalmanovitz,* 185 Cal.App.2d 149, 154 [other citations omitted].)" (*Degnan* v. *Morrow* (1969) 2 Cal.App.3d 358, 362 [82 Cal.Rptr. 557]. See also 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 52, p. 4066.) The plaintiffs contend that since the judgment, although labeled "Interlocutory Judgment," disposed of all the issues of the case, except

for proceedings to be held on motion to determine the amount of attorney's fees already awarded, the judgment was for all practical purposes final. They also contend that since the judgment was in effect entered in an action in which they sought to redeem real property from a lien thereon, it was appealable under the provisions of subdivision (h) of section 904.1 of the Code of Civil Procedure, even though interlocutory.[3]

The governing principles are set forth in *Lyon* v. *Goss* (1942) 19 Cal.2d 659 [123 P.2d 11], as follows: "A decree in equity which is denominated 'interlocutory' and directs a further hearing for certain purposes, may make so complete and final an adjudication of all issues of fact and law as to constitute a 'final judgment' within the meaning of that term as used in the statutes concerning appeals. The problem of determining whether a particular decree is essentially interlocutory and nonappealable, or whether it is final and appealable is often a difficult one. Two conflicting lines of authority bearing upon the subject are reviewed in *Security-First Nat. Bank* v. *Superior Court,* 132 Cal.App. 683 . . . [Citations.] It is not the form of the decree but the substance and effect of the adjudication which is determinative. As a general test, which must be adapted to the particular circumstances of the individual case, it may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory." (19 Cal.2d at pp. 669-670. See also *Zappettini* v. *Buckles* (1914) 167 Cal. 27, 32-34 [138 P. 696]; *Palo Alto-Menlo Park Yellow Cab Co.* v. *Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 129 [135 Cal.Rptr. 192]; *Goodman* v. *Community S. & L. Assn.* (1966) 246 Cal.App.2d 13, 20 [54 Cal.Rptr. 456]; *Brown* v. *Memorial Nat. Home Foundation* (1959) 158 Cal.App.2d 448, 452-455 [322 P.2d 600, 72 A.L.R.2d 997] [cert.den. (1959) 358 U.S. 943 (3 L.Ed.2d 352, 79 S.Ct. 353)]; *Caminetti* v. *Imperial etc. Life Ins. Co.* (1942) 54 Cal.App.2d 514, 516-517 [129 P.2d 432]; 6 Witkin, *op. cit.,* Appeal, § 53, pp. 4067-4068; and 4 Witkin, *op. cit.,* Judgment, §§ 7, 8 and 10, pp. 3186-3188.)

---

[3]Section 904.1 of the Code of Civil Procedure provides in pertinent part:

"An appeal may be taken from a superior court in the following cases:

"(a) From a judgment, except (1) an interlocutory judgment, other than as provided in subdivisions (h), (i) and (j), . . ."

"(h) From an interlocutory judgment, order, or decree, hereafter made or entered in an action to redeem real or personal property from a mortgage thereof, or a lien thereon, determining such right to redeem and directing an accounting. . . ."

■ In this case, unlike *Lyon* v. *Goss,* but as in the other cases cited, there was nothing further in the nature of judicial action on the part of the court essential to a final determination of the asserted rights of the respective parties. Those rights were fully established by the judgment. The mere fact that other proceedings were deemed necessary by the court to carry the judgment into effect did not render the judgment interlocutory rather than final. Under the trial court's theory of the case—that the defendants were entitled to recover attorney's fees for nonjudicial foreclosure in the principal action despite having dismissed their cross-complaint for judicial foreclosure—it properly, in the exercise of its equitable jurisdiction, delayed action on that matter pending completion of the foreclosure. (See *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 599 [83 Cal.Rptr. 418, 463 P.2d 770]; 4 Witkin, *op. cit.,* Judgment, § 79, p. 3240; and 1 Witkin, *op. cit.* (1970) Jurisdiction, § 286, p. 827. Note, *Raff* v. *Raff* (1964) 61 Cal.2d 514, 519 [39 Cal.Rptr. 366, 393 P.2d 678].)[4]

We conclude that the appeal is properly before this court. It is therefore unnecessary to consider the plaintiffs' more tenuous contention that the judgment should be treated as an interlocutory judgment in an action for redemption from a lien. Insofar as this case had any attributes of such an action it was finally determined against the plaintiffs by the so-called "Interlocutory Judgment," and, as we have noted, is therefore appealable.

## II

The circumstances and material documents evidencing the transactions between the parties are not disputed and can be found in the findings of fact of the trial court and the exhibits before it. The controversy centers on mixed questions of fact and law set forth in the findings of fact, on the conclusions of law, and on the judgment itself.

Defendant Alyce Lee Burns purchased the property involved in this litigation, consisting of 750 acres, in 1952. The property is located in the upper Palo Alto foothills within the city limit, and in 1959, it was

---

[4]The records of this court, referred to by the parties in their briefs, reflect that proceedings were pending in the trial court to determine the amount of attorney's fees in November 1976, almost eight months after the entry of the judgment that is the subject of this appeal. (Eldridge v. Superior Court (Burns) 1 Civ. 40088.) According to plaintiffs the court made an "Ancillary Judgment" on December 23, 1976, fixing the attorney's fees from which the plaintiffs have appealed.

annexed to the City of Palo Alto and zoned REA (residential estates —one residential unit to one acre). Defendant's husband, Emmett Burns, at all times herein, acted as her agent in matters dealing with property. Mr. Burns and the plaintiff Donald F. Eldridge were both sophisticated in business affairs.

In 1968, after negotiations between Burns and Eldridge, the property was sold to Eldridge for the agreed sum of $2,050,000, plus an assumption of assessments for sewer and water in the approximate amount of $400,000. Six hundred thousand dollars was paid at close of escrow and 150 acres were conveyed to the plaintiff free and clear of any lien of the deed of trust. The balance of $1,450,000 was evidenced by a promissory note. It was secured by the remaining 600 acres and was payable in 10 annual installments. The deed of trust contained provisions requiring the purchaser to pay all taxes and assessments when due;[5] and to further pay all of the indebtedness when due.[6] In addition, it contained a release provision allowing the property owner to release acreage at the rate of one acre for every $3,000 paid upon the promissory note and gave the purchaser the right to select said acreage so long as the buyer selected property that was "contiguous" to the 150 acres that the purchaser acquired free and clear at close of escrow, and provided, further, that the remaining land, which would be subject of the deed of trust would have the right of ingress and egress to a public highway meeting official requirements.[7]

---

[5]The deed of trust provided, "To pay: at least ten days before delinquency, all taxes and assessments affecting said property, including assessments on appurtenant water stock; and to pay, when due, all incumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; and all costs, fees and expenses of this Trust."

[6]The deed of trust recites it is to secure payment of the "indebtedness evidenced by a promissory note, . . . executed by Trustor in the sum of . . . $1,450,000.00." In the note Eldridge agreed to pay that sum "with interest accruing only from August 1, 1968, on unpaid principal at the rate of six (6) percent per annum, payable annually as below; principal payable in installments aggregating at least . . . $145,000.00, or more, during each year, beginning on or before the 15th day of March, 1969, and thereafter on or before the 15th day of March of each successive year, together with then accrued interest, and continuing until said principal ·and interest have been paid." The note further provided: "Should default be made in payment of any installment of principal or interest when due the whole sum of principal and interest shall become immediately due at the option of the holder of this note. Principal and interest payable in lawful money of the United States..If action be instituted on this note, I promise to pay such sum as the Court may fix as attorney's fees. This note is secured by a DEED OF TRUST. This promissory note obligation and the Deed of Trust securing it are subject to 'Release Clause' benefits as indicated in said Deed of Trust."

[7]The deed of trust reads: "Beneficiary agrees to make partial reconveyances to Trustor of portions of the property described herein, as selected by Trustor, free of the lien of

In 1969 the City of Palo Alto began studying the down zoning of the property in the foothills, which included the subject parcel. During prior years, however, the city had annexed and encouraged development by encouraging the formation of sewer and assessment districts to service residential development in the foothills area. As a result of the city's efforts to encourage development in the foothills, the property became subject to approximately $400,000 assessments for the installation of sewer and water lines. At the time of purchase, it was reasonable for both parties to assume the continuity of the city conduct towards the property.

Soon thereafter, the city administration changed its course of conduct and started a series of actions which culminated in 1972 in a rezoning of the property into open space, allowing the owner to construct one dwelling for every 10 acres and placing other severe restrictions on the placement and location of any proposed dwellings. The city actions substantially affected the value of the property. Eldridge sought relief against city by filing an action for inverse condemnation. (See *Eldridge* v. *City of Palo Alto* (1976) 57 Cal.App.3d 613 [129 Cal.Rptr. 575].)[8]

The plaintiff failed to pay taxes and assessments due commencing December 10, 1970, and continuing until the date of the trial. The amount of taxes then due was in excess of $40,000, and the Santa Clara County Tax Assessor claimed that assessments were due in the amount of $230,000 for an aggregate of $270,000 as of June 30, 1975.

The plaintiff paid the installments of principal falling due in the years 1969, 1970, 1971, 1972 and 1973, in the aggregate sum of $725,000

---

this Deed of Trust from time to time as requested by Trustor and to the extent or at the rate of one acre being so released from this Deed of Trust for each Three Thousand Dollars ($3,000.00) principal payment paid to Beneficiary (plus then accrued interest); provided, however, that any such acreage selected for release by Trustor shall be contiguous to the land previously released from said Deed of Trust and further, no acreage may be released from said Deed of Trust unless there is afforded to the remaining land which is the subject of said Deed of Trust security, rights of ingress and egress over at least some easement, right of way meeting official requirements or dedicated street." The inserted clause is followed by a handwritten insert reading "Approved by Alyce Lee Burns."

[8]The trial court gratuitously indicated "that the City acted capriciously toward the property owners"; and that Eldridge acted "wisely" in filing his action. The findings further recite, "It should be noted that the matter is unadjudicated at this time. The court finds that the outcome in the Palo Alto case is speculative and judgment here is not predicated on the outcome. [¶] Notwithstanding the foregoing, however, plaintiff was not thereby excused from his obligation under the deed of trust to keep all taxes and assessment payments current, nor was he excused from his obligation on the note."

together with accrued interest. On February 9, 1974, the plaintiff made a formal demand for a reconveyance of 241 acres, representing the acreage to be released at $3,000 per acre for the principal payments made on the note. The defendant on March 18, 1974 made a counteroffer in the form of a conditional request for reconveyance to the trustee under the deed of trust.[9]

The counteroffer was unsatisfactory to the purchaser and he thereafter failed to rectify a default in the payment of the installment of principal and interest due March 15, 1974. On March 19, 1974, the seller gave notice of her election to accelerate the due date of the balance of the note and made demand for payment of the entire sum due. On August 7, 1974, the purchaser filed the instant action. (See part I above.) At the time of judgment in March 1976, the plaintiff was in default for the payments due in 1974 and 1975 in the approximate sum of $377,000, and he had made no tender to cure the defaults in those payments and in the taxes and assessments.

## III

In the counteroffer the seller insisted that the buyer pay up the arrearages in taxes and assessments as a condition precedent to any release. The plaintiffs in their complaint admitted a default in the payments of taxes and assessments commencing with those due for the 1970-1971 fiscal year, and aggregating of $176,314.34, plus interest and penalties, but claimed the refusal to pay was excused by governmental interference with and frustration of plaintiffs' use of the utilities for which 70 percent of the taxes and assessments were levied. The defendants in their answer admitted that, as plaintiffs alleged, the

---

[9]She advised the purchaser's attorneys as follows: "I have this day executed a request for partial reconveyance of the 241 acre parcel from my Deed of Trust recorded in Book 8057 of Official Records, page 694. Transamerica Title Insurance Co. is authorized to record said reconveyance when your client, Mr. D. F. Eldridge has complied with the following: [¶] 1) County and City taxes and assessments have been currently paid on the lands secured by my Deed of Trust. [¶] 2) A means of access be reserved accross [sic] the existing roadway running from the remaining lands secured by my Deed of Trust to Page Mill Road. Said roadway being located near the existing improvements on the land so being reconveyed. [¶] 3) Paragraph three of the amendment to the Offer to Buy Real Estate dated March 5, 1968, provides that the 7 acre parcel where the residence and related accessary [sic] buildings and improvements be released for the sum of $97,500.00. This 7 acres is included within the lands you now wish released. If you now wish to release said 7 acre parcel an additional $76,500.00 must be paid at this time. We have no objection if you do not wish to do this, you may select another 7 acre parcel that does not include the improvements."

purchaser was in default, and in their pretrial statement they asserted: "Seller is not required to release his lien from the deed of trust as to any acreage where there has been a prior default by buyer for payment of taxes and assessments. The deed of trust specifically requires taxes to be paid and the contract of sale states that buyer will assume the assessments."

The court impliedly found that the buyer was not entitled to a release of property while he was so in default.[10] It concluded, "That the plaintiff, at the time of the original requested release, was in substantial default of the terms and conditions of the promissory note and deed of trust by reason of the failure to pay taxes and assessments."

The buyer contends that he was entitled to secure a release of property, measured by the amount of principal paid in on the loan, despite the facts that prior to his request he was in default in the payment of taxes and assessments, and that immediately following his request for a release, he defaulted in the payment of the 1974 installment of principal and interest and the seller declared the entire unpaid balance due. (*San Diego Construction Co.* v. *Mannix* (1917) 175 Cal. 548, 553, 554 and 556-558 [166 P. 325]; *Conley* v. *Poway Land & Inv. Co.* (1965) 232 Cal.App.2d 22, 25-28 [42 Cal.Rptr. 636]; *Houtz* v. *Beeman Investment Corp.* (1935) 6 Cal.App.2d 645, 647-648 [44 P.2d 660]; and *Sacramento S. F. L. Co.* v. *Whaley* (1920) 50 Cal.App. 125, 134-138 [194 P. 1054]. Cf. *Rubin* v. *Fuchs* (1969) 1 Cal.3d 50, 53-55 [81 Cal.Rptr. 373, 459 P.2d 925]; and *Kimball* v. *Snyder* (1932) 215 Cal. 66, 68-70 [8 P.2d 133]. Note *Vilkin* v. *Sommer* (1968) 260 Cal.App.2d 687, 689-692 [61 Cal.Rptr. 837].) The seller contends that it was necessary that there be no default at the time of the request for a release because the promise to release and the promise to pay taxes, assessments, principal and interest are mutually dependent. (*Kenworthy* v. *State of California* (1965) 236 Cal.App.2d 378, 382-384 [46 Cal.Rptr. 396]; *Conley* v. *Poway Land & Inv. Co., supra,* 232 Cal.App.2d 22, 27; and *Bradbury* v. *Thomas* (1933) 135

---

[10]The court found in effect: At the time of the release request, plaintiff was in substantial default in the payment of taxes and also in default in the payment of assessments. The property had been sold to the state by reason of nonpayment of taxes and assessments, and the owner's right of redemption would expire on June 30, 1976. While the plaintiff contests the validity of the assessments, there was no court adjudication regarding the power of the city to relieve the property owner from paying such assessments. The court refused to speculate on whether the city actions regarding the assessments were valid.

Cal.App. 435, 441-444 [27 P.2d 402]. Note also, *Salot* v. *Warshow* (1958) 157 Cal.App.2d 352, 358-359 [320 P.2d 926].)[11]

In *San Diego Construction Co.* v. *Mannix, supra,* 175 Cal. 548, the buyer paid $12,500 down on a $92,636 purchase price, and gave a trust deed to secure the payment of the balance in five installments, the first of which was due July 8, 1913, and then in four annual installments commencing January 8, 1914. The buyer was entitled to the release of lots at $450 per lot for payments to be credited on the notes. He was unable to pay the $12,500 due July 8, 1913, but arranged with the seller's successor for partial payments aggregating almost $15,000 in lieu of that payment in consideration of an extension. Those payments were made, and on December 19, 1913, the buyer demanded a reconveyance of 27 lots, over $12,150 having been paid in. No conveyance was made, and the buyer, as in this case, failed to pay the next installment of principal. Unlike this case, no attempt was made to secure a conveyance of the lots or to prevent foreclosure. The seller caused all of the property to be sold on the basis of the buyer's default, and the latter sought recovery of all the sums paid on the contract. The trial court found for the seller and ruled that the failure to convey the lots demanded was not a breach of the contract. The court on appeal held that the trial court erred in not applying the following principle: "The general rule, where performance of a contract to convey is due and the vendor refuses to perform it, or fails to perform on being duly requested to do so, is that the vendee may, if he chooses, treat such breach as an abandonment and termination of the contract and may then abandon it himself, and, 'the contract having thus come to an end, he may sue at law to recover what he has paid, in an action for money had and received; for, the contract being at an end, the vendor holds money of the vendee to which he has no right, and to repay which, therefore, the law implies his promise.' (*Glock* v. *Howard,* 123 Cal. 10, [other citations omitted].) Where the contract is divisible and separable, so that a full performance of one part may be made by both parties without affecting the subsequent performance, or right of performance, as to the remainder, and a breach of that character occurs as to a part thus separable, the rule above stated must be also applicable with regard to the money paid by the vendee upon such separable part." (175 Cal. at pp. 553-554.) The court pointed out: "There is nothing in

---

[11]For a review of precedents concerning the effect of the mortgagee's default on his rights under a release clause see: 59 Corpus Juris Secundum, Mortgages, section 479, subdivision b, pages 759-760; 55 American Jurisprudence Second, Mortgages, sections 469-471, pages 479-481, and sections 1147-1149, pages 951-952; Annotation, Mortgage-Partial Release Provisions (1972) 41 A.L.R.3d 7, sections 11-18, pages 56-109; Miller & Starr, Current Law of California Real Estate (1975) section 3:77, page 476; and 34 California Jurisprudence Second, Mortgages, section 379, page 48.

either of the writings to the effect that a deed could not be obtained unless it was demanded at the time the money was paid or that a failure to make such concurrent demand should operate as a waiver of the right to a deed" (*id.,* p. 556); and "We find no language that can be construed to declare that a deed or release could not be demanded on account of a payment made after maturity." (*Id.,* p. 557.) In the latter connection the opinion indicated, " 'Courts are disinclined to construe the stipulations of a contract as conditions precedent, unless compelled by the language of the contract plainly expressed' [citation], and particularly so when the result would be to work a forfeiture. [Citation.]" (*Id.,* p. 556.)

In reversing the judgment the court indicated: "The sum of $450 per lot for the lots for which a deed was demanded is the limit of the recovery to which the plaintiff would be entitled." (*Id.,* pp. 558-559.) ▮ From this case we distill that a release clause if otherwise valid, entitles the buyer, who makes a payment in accordance with its terms, to either the land, or at least to the return of the payment made if a reconveyance is refused; and that such rights are not lost by the buyer's subsequent default in payments on the purchase price.

In *Conley* v. *Poway Land & Inv. Co., supra,* 232 Cal.App.2d 22, the trial court ordered the defendant buyer to reconvey to the trustee under the deed of trust 38 acres which the seller claimed had been improperly released. The opinion notes, "One of the covenants by Poway was that it would pay the taxes before due. It therefore was not in default in this respect when the $40,250 payment was made, but it was in default when it requested reconveyance and when the reconveyance was made. The trial court found that the property had been wrongfully released, ordered Poway to quitclaim the property back to the trustee, removed the cloud on the title and quieted the title in the trustee." (232 Cal.App.2d at p. 24.) The release clause had an express provision reading, " 'So long as the trustor be not in default concerning any of the covenants contained herein or with respect to the payments due on the promissory note secured hereby, a partial reconveyance may be had and will be given from the lien or charge hereof of any portion of the property herein before described upon payment of an amount to apply on the principal of said note, based on a rate of $1,149.00 for each acre. . . .' " (*Id.,* p. 25.) The buyer had paid in $40,250, ostensibly for 50 acres, but admittedly $971.40 short. He had demanded and received conveyances aggregating 12.27 acres prior to defaulting in the payment of taxes, and had demanded and received 38 acres two months later. Admittedly the buyer had received more than he had paid for.

The court on review stated, "Were delay in requesting reconveyance and supplying a description of the acreage desired the only factor involved here, equitable considerations would surely dictate an unqualified judgment in appellants' favor. The cases of *Park Inv. Co.* v. *Vanderzee Bros. Bldg. Co.*, 119 N.J. Equity 1 . . .; *Bleyer* v. *Veeder,* 119 N.J. Equity 398 . . . and *Deering Harvester Co.* v. *C. L. Smith, Farm Land Development Co.,* 146 La. 301 . . . all include elements other than those involved here. But the discussions therein are of some persuasion." (*Id.,* pp. 26-27.)[12] After analyzing *Sacramento S. F. L. Co.* v. *Whaley, supra,* 50 Cal.App. 125 (see below), the court concluded, "We hold that failure on the part of Poway to require performance by the trustee before said trustor had defaulted in other particulars did not extinguish its right to have reconveyed that which it had actually paid for and that this right survived default." (*Id.,* p. 28.)

In *Houtz* v. *Beeman Investment Corp., supra,* 6 Cal.App.2d 645, the mortgagee appealed from that portion of a foreclosure decree which released a portion of a lot held by a transferee of the mortgagor. Under the terms of a release clause the mortgagor had made payments entitling it to the release of four lots at $470 per lot. By mistake, discovered by the mortgagee 10 days after it occurred, double releases were given on the same two lots. In 1929 the transferee purchased one-half of a lot with a release price of $700. The mortgagor in 1932 tendered $350 to the mortgagee and requested a conveyance of the half lot at a time when the mortgage was not in default. Later that year the mortgagor defaulted and the foreclosure action ensued. The court held that from the time the mortgagee discovered the mistake the mortgagee was entitled to releases to the extent of the $940 paid in for which no release had actually been given. The court concluded that the execution of an extension agreement, between the uncompensated payment and the later payment and demand, did not affect the rights of the mortgagor or its transferee to a partial release. The court concluded: "The respondent as one of the purchasers contemplated by the agreement, between the mortgagor and the appellant, had paid the full purchase price before any default existed under the terms of the mortgage. The mortgagor in turn had paid to the appellant an amount considerably in excess of that required to release

---

[12]The cited cases are all cases, like that at bar, in which the payments and demand for a release were made prior to a default which led to the mortgagee's foreclosure. In *Deering Harvester Co.* v. *C. L. Smith Farm Land D. Co.* (1920) 146 La. 301 [83 So. 580], the court noted: "The reason why the defendant applied for the release was that it needed the land in order to mortgage it for procuring the funds with which to meet the 1st of December payment." (146 La. at p. 307 [83 So. at p. 582].) So here the buyer was deprived of an asset to which he was otherwise entitled.

the whole of lot 179, for which amount no lots had been released. The court had the power and it was its duty to prevent so unjust and inequitable a result as that now contended for by the appellant, and the relief demanded by the appellant was properly given upon the condition that the equitable rights of the respondent be protected." (6 Cal.App.2d at p. 648.) ■ The foregoing conclusion also indicates that release rights which have accrued before default are not lost by a subsequent default.

This principle was established in this state earlier in *Sacramento S. F. L. Co.* v. *Whaley, supra,* 50 Cal.App. 125. There the mortgagor on February 19, 1914, had given a note payable in five years for $6,748, due on an approximately 60-acre parcel with 7 lots varying in size from about 5 to 13 acres. The mortgage provided for the release of "any ten acre lot or more" upon the payment of $125 per acre. Subsequently, a second mortgage was given for $1,000. Interest and taxes were paid through February 19, 1917, but thereafter no payments were made, and in March 1918 the mortgagee gave notice of default and acceleration of the due date of the entire debt. On May 24, 1917, the second mortgagee tendered $4,375 and demanded the conveyance of five lots containing 34.86 acres. That sum was in excess of the $4,357.50 required at $125 per acre but was insufficient to include the amounts due for delinquent taxes and interest. In the mortgagee's foreclosure action the second mortgagee alleged it had also tendered "such further sum as said [mortgagee] had expended in taxes or other expenses for the [five lots]," and sought their release. The trial court decreed that the five lots would be released if the second mortgagee paid in the release price, plus $134.93 accrued taxes paid by the mortgagee on the five lots with interest on that sum. The mortgagee appealed.

After holding that the agreement to release was a covenant running with the land which the second mortgagee could assert (50 Cal.App. at pp. 129-133) the court addressed the mortgagee's objections to the certainty of the clause (see part IV below), and the rights to enforce the clause after default. On the latter issue the court concluded as follows: "No California cases are cited upon the point involving the question whether the right to an enforcement of the release clause still subsisted after default in the payment of interest and taxes and after the mortgage holder had declared the whole amount of principal, interest, and taxes due and payable because of such default. The following cases from other jurisdictions, however, hold that the right to a partial release, by the payment of a stipulated sum, is available after default in payment and

the commencement of a foreclosure suit: *Vawter* v. *Crafts,* 41 Minn. 14, [42 N. W. 483]; *Gammell* v. *Goode,* 103 Iowa, 301 [72 N.W. 531]; *Nims* v. *Vaughn,* 40 Mich. 356; *Chrisman* v. *Hay,* 43 Fed. 552. . . . [¶] It will be observed that the release clause with which we are directly concerned contains no provision specifying a particular time at which payments may be made." *(Id.,* pp. 136-137.)[13] The court also upheld the tender of release price and taxes as sufficient. *(Id.,* pp. 137-138.) It failed to comment with respect to the delinquent interest.

■ From the foregoing it is apparent that in the absence of countervailing principles the buyer who, when he made his demand on February 9, 1974, had paid in a total of $725,000, one-half of the balance of the original unpaid purchase price of $1,450,000, $290,000 prior to any default, and $435,000 after the alleged default in payment of taxes and assessments, and had also paid all the interest on the unpaid balances through March 15, 1973, was at least entitled to a conveyance of acreage equivalent to the payments before default, or a return of those payments if a release was not forthcoming. The seller practically concedes as much in her brief, and relies upon other principles to defeat the buyer's claims. Under a strict application of *Sacramento S. F. L. Co.* v. *Whaley,* the buyer would be entitled to the entire 241 acres demanded. Although he did not tender the taxes on the 241 acres, no one had paid them, and he would, unlike the redeeming second mortgagee in the cited case, take the acreage subject to the taxes and assessments on the whole, subject to a right to secure apportionment. (See Rev. & Tax. Code, §§ 2801-2827 and 4131-4159.) As is noted below (part VI), however, it might be more equitable, in computing any acreage with which the buyer was to be credited, to reduce the credits for payments made in 1971, 1972 and 1973 by the amount of the respective taxes and assessments due on the whole of the property at the time those payments were made.

In our opinion the specific principles reviewed above control any general statements, such as that the promisee buyer cannot recover on

---

[13]In each of the cited cases the release clause was recognized as valid up to the time of actual sale under foreclosure proceedings, even though demand and tender for a release was made after default. In *Nims* v. *Vaughn* where tender was made after default and refused, the mortgagor's transferee, on the basis of a prior tender, was permitted to recover lots from the mortgagee after the latter had bid in the property and received a deed at the foreclosure sale. The court also rejected the mortgagee's plea that the release clause, which, when fully exercised, failed to compensate the mortgagee for the full amount of the entire debt, should not be enforced in equity. (40 Mich. at pp. 360-361.) On the other hand, in *Chrisman* v. *Hay,* the court protected purchasers from the mortgagee, but refused to protect the mortgagor personally on demands and tender after default. (43 F. at pp. 554-555.)

the agreement to release unless he shows that it was only the defendant seller's acts which precluded him from paying all the obligations he undertook in full. (See *Kenworthy* v. *State of California, supra,* 236 Cal.App.2d 378, 394-395; and 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 619, p. 527.) In *Conley* v. *Poway Land & Inv. Co., supra,* 232 Cal.App.2d 22, the court apparently rejected the buyer's offer to pay an additional sum so as to warrant the retention of the full 38 acres, or 38.27 acres. There, however, the release provision was expressly conditioned on freedom from default, and the court expressly distinguished the earlier *Sacramento S. F. L. Co.* v. *Whaley* case. It gives no comfort to the seller.

In *Salot* v. *Wershow, supra,* 157 Cal.App. 352, the second encumbrancer agreed to release lots if the buyer made payments on the first encumbrance and secured a release pursuant to the terms of the first deed of trust. Such payments increased the second lienholder's equity in the remaining lots. The trial court had dissolved a preliminary injunction restraining foreclosure by the second lienholder on 18 lots for which the buyer had demanded releases shortly before the maturity of the second junior loan because it found that the buyer had committed an anticipatory breach by announcing that he could not pay that loan when due. The court on appeal rejected that theory as not sustained by the facts as law. It did, however, affirm the judgment denying the buyer relief because the record reflected that no release of those lots under the first encumbrance had been effected prior to the maturity of the obligation secured by the second lien. It concluded, "We think the proper construction to be placed upon the language used is to determine that the parties intended that at all times on and after the maturity date of the Wershow note and trust deed on May 1, 1955, plaintiffs would be obliged to tender performance on their part of all concurrent conditions, including the tender of payment of $63,750 principal plus interest then due and owing upon the maturity date of the Wershow note and trust deed. [Citations.]" (157 Cal.App.2d at p. 359.) The court did note, "In our opinion upon a showing at any time prior to [the maturity of the second obligation], that the lots had been released from the [first] trust deed according to its terms, the obligation to release lots under the [second trust] deed would have become unconditional." (*Id.*) So here prior to the maturity of the obligation, even as accelerated, the buyer had both paid sums entitling him to a release, and demanded the release.

In *Bradbury* v. *Thomas, supra,* 135 Cal.App. 435, the mortgage, which had been assumed by the plaintiffs, provided, " 'And also that mortgagor

while not in default shall be entitled to a separate release of each or any of said lots or parcels at a flat release price of One Hundred Dollars ($100.00) . . . .' " (135 Cal.App. at p. 441.) The purchase money notes secured by a mortgage on 86 lots were each in the sum of $3,833 and matured respectively on February 10, 1927, and February 10, 1928. The notes were not paid when due, but in 1929 the plaintiffs paid $1,533.20 on the principal of the notes pursuant to an extension agreement. The interest was paid to February 10, 1931. In December 1931 the plaintiffs demanded conveyance of 15 lots and on the mortgagee's refusal brought suit to quiet title to those lots. The mortgagee cross-complained for foreclosure of all of the 86 lots involved and prevailed. The court, on review, concluded that the release claim was not applicable because the plaintiffs were in default at all times after February 10, 1929, and the partial payments did not relieve that default (135 Cal.App. at p. 443). The court distinguished *Sacramento S. F. L. Co.* v. *Whaley, supra,* 50 Cal.App. 125, because in that case the release clause, as is true here, contained no limitation that any payment for a release of land from the mortgage lien had to be made when the mortgagors were not in default. *Bradbury* v. *Thomas, supra,* pages 443-444, does not sustain the seller's position that the buyer's payments on principal, after default in the payment of taxes and assessments, entitled the buyer to no credit for a release of acreage.

The seller also notes that a commentator has suggested that since the passage of antideficiency legislation the court's attitude toward release clauses may change. Hetland, parenthetically notes, "Cases prior to the enactment of the antideficiency legislation tended to hold enforceable any kind of release provision (see *e.g. Sacramento Sav. & Loan Co.* [*sic Sacramento Suburban Fruit Lands Company*] v. *Whaley* (1920) 50 CA 125, 194 P 1054), but the seller needed less protection since he could enforce his claim against the buyer personally." (Hetland, Secured Real Estate Transactions (Cont.Ed.Bar 1974) § 10.16, p. 248.) The logic of that statement may be questioned, if the buyer secures the release of the choice lots and sells them without proceeding with the development of the rest of the property, there is no assurance that he would be solvent. Furthermore, whether or not the seller needs protection depends upon the relative bargaining position of the parties at the time the sale and financing provisions are effected. Should the seller who had driven a hard bargain with the buyer be protected? Since the enactment of antideficiency legislation in 1933 each party must be deemed to have contracted with notice of its provisions. We also note that since 1963, the antideficiency provisions of section 580b of the Code of Civil Procedure

do not apply to third party lenders of the purchase price of property not purchased for a dwelling for not more than four families. By dismissing her cross-complaint and proceeding under the power of sale, the seller avoided what equitable adjustment might otherwise have been made to protect the buyer in the event of foreclosure. (Cf. Code Civ. Proc., §§ 580a and 580d.)

It is, therefore, concluded that the buyer was not deprived of what rights otherwise may have accrued under the release clause because of the time and circumstances under which the payments of principal were made, and under which the release of property was demanded.

## IV

The court found that the buyer's request for release was unconscionable, inequitable and totally unfair to the seller (see parts V and VI below). As a result it further found that it did not "need to reach a conclusion concerning the validity of the release clause per se with respect to its uncertainty, ambiguity or the validity of the release clause on its face," or "the validity of the release agreement as it pertains to the Statute of Frauds. . . ." ■ Since the seller urges the uncertainty of the agreement in support of the judgment, and since the buyer's rights whether specifically enforceable or not, must rest on the validity of the release clause, we undertake to examine that question. It is obvious that any attempt to determine whether the buyer's demand for a release was unconscionable, inequitable or unfair can only be determined in the light of the buyer's rights and the seller's obligations under that clause.

The trial court did find that the deed of trust contained "a release provision allowing the property owner to release acreage at the rate of 1 acre for every $3,000 paid upon the promissory note and gave the purchaser the right to select said acreage so long as the buyer selected property that was 'contiguous' to the 150 acres that the purchaser acquired free and clear at close of escrow, and provided, further, that the remaining land, which would be subject of the deed of trust would have the right of ingress and egress to a public highway meeting official requirements." (Cf. fn. 7 above.) Civil Code section 3390 provides in pertinent part: "The following obligations cannot be specifically enforced: . . . 5. An agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable."

We start with recognition that although the question of the certainty of the description of the property to be released was not litigated in the cases reviewed in part I, they impliedly do recognize the right of the parties to confer a right of selection of property at a unit price upon a buyer. (See *San Diego Construction Co.* v. *Mannix, supra,* 175 Cal. 548, 551, 555-556 and 557 [right to select lots]; *Bradbury* v. *Thomas, supra,* 135 Cal.App. 435, 441 [right to select lots]; *Vilkin* v. *Sommer, supra,* 260 Cal.App.2d 687 [right to select parcels]; *Conley* v. *Poway Land & Inv. Co., supra,* 232 Cal.App.2d 22, 25 [right to select acreage]; *Salot* v. *Wershow, supra,* 157 Cal.App.2d 352, 354 [right to select lots]; *Houtz* v. *Beeman Investment Corp., supra,* 6 Cal.App.2d 645 [right to select lots of each of two classifications]; *Sacramento S. F. L. Co.* v. *Whaley, supra,* 50 Cal.App. 125, 136 [right to select lots of a certain size].)[14]

In *Fleishman* v. *Woods* (1901) 135 Cal. 256 [67 P. 276], the contract provided that the landowner was to convey four and one-half acres off the west half of ten acres, as selected by him, to the defendant's assignor for establishing an orchard on the land. When the landowner sought to quiet his title to the ten acres, the court sustained the claim of the defendant, as he and his assignor had performed the work, and defendant had entered into possession of the land until wrongfully ousted by the landowner. The court ruled, "It is also contended by appellant [landowner] that the proper remedy of respondent upon said contract, if suit had been brought in proper time, was an action for damages. His argument is, that as appellant had the right to make the selection of the four and one-half acres out of a specified ten acres, specific performance is not the proper remedy. There is no uncertainty as to the manner in which the selection is required to be made, nor do we see any lack of power in a court of equity to compel the selection to be made." (135 Cal. 256, 260. See also *Preble* v. *Abrahams* (1891) 88 Cal. 245, 249-250 [26 P. 99]; *Stockwell* v. *Lindeman* (1964) 229 Cal.App.2d 750, 754 [40 Cal.Rptr. 555]; *Magna Development Co.* v. *Reed* (1964) 228 Cal.App.2d 230, 234-235 [39 Cal.Rptr. 284]; *Leider* v. *Evans* (1962) 209 Cal.App.2d 696, 699 [26 Cal.Rptr. 123]; *Ontario Downs, Inc.* v. *Lauppe* (1961) 192 Cal.App.2d 697, 704-705 [13 Cal.Rptr. 782]; *Salmons* v. *Jameson* (1956) 144 Cal.App.2d 698, 703-704 [301 P.2d 431]; *Twisselmann* v. *Cohn* (1943) 57 Cal.App.2d 987, 990-991 [136 P.2d 33]; and *Kelley* v.

[14]Generally, with respect to the certainty of description of the property involved in a release, see: 59 Corpus Juris Secundum, Mortgages, section 479, pages 758-759; Annotation, Mortgage—Partial Release Provisions, *supra,* 41 A.L.R.3d 7, sections 8, 9 and 10, pages 44-56; 27 California Jurisprudence Third, Deeds of Trust, section 182, page 192; Miller & Starr, California Law of Real Estate, *supra,* section 3.77, pages 472-474; and Hetland, California Real Estate Secured Transactions (Cont.Ed.Bar 1970) sections 5.25, 5.26, 5.27, 5.28 and 5.29, pages 222-225.

*Russell* (1942) 50 Cal.App.2d 520, 529 [123 P.2d 606]. Cf. *Hines* v. *Copeland* (1913) 23 Cal.App. 36, 42-43 [136 P. 728].)

In support of the judgment the seller relies upon *Lawrence* v. *Shutt* (1969) 269 Cal.App.2d 749 [75 Cal.Rptr. 533], and cases cited therein which we have noted below. There the plaintiff buyers, as in this case, sought specific performance of a release clause, declaratory relief and a decree quieting title to the property for which a release was demanded. The sellers, again as in this case, claimed that the release clause was invalid, but unlike this case, they did not seek to retain the fruits of the transaction, but counterclaimed for rescission. They were awarded judgment cancelling the deeds and the deeds of trusts upon the property, upon restoring to the buyers the $250,000 paid under the agreement. The agreement and the deeds of trust fixed a release price per acre for three separate portions of the total 1,280 acres sold, with conditions involving the minimum size parcel to be released, contiguity, the relationship of the released parcels to certain boundaries, and the establishment of rights of way to unreleased parcels. It was further provided that the sellers would release property having a release value of $150,000 on close of escrow when the buyers paid $250,000 on the total price of $1,280,000. Prior to the close of escrow the buyers caused to be prepared and forwarded to the sellers a map and legal description of two parcels, totaling 143.5 acres, which they requested be excluded from the deed of trust in accordance with the release clause. The sellers refused to release the property but the escrow nevertheless closed, and the deeds and deeds of trust covering the whole property were recorded. The buyers immediately commenced their action and attached the proceeds of the escrow and other accounts of the sellers. They renewed their demand for a partial reconveyance. A month later the sellers gave notice of rescission setting up several grounds of which mistake, invalidity of the agreement and failure of consideration were urged at trial. It was only at a pretrial conference that they urged that the request for a release was denied because it failed to comply with the release provision in two respects, i.e., the inadequate size of one parcel requested, and because its effect would deprive the sellers of reasonable access to unreleased portions of the land.

With this background the court on appeal first addressed the question of whether "the trial court erred in determining that the provisions of the escrow instructions and the deed of trust calling for the release of portions of the property were so vague, indefinite and uncertain as to be unenforceable and hence rendered the entire sale transaction void and of

no force or effect." (269 Cal.App.2d at p. 760.) The court first pointed out that it was not bound by the trial court's construction of the release clause if such construction was erroneous. (*Id.*) Here, as we have pointed out, the court's construction of the release clause was not the focal point of its decision, and it apparently paraphrased its contents to the satisfaction of each party in the findings. The court then laid down some general percepts that are applicable here, in the following terms: "It is well settled that courts will give written agreements, if reasonably possible, a construction which will result in their being enforceable contracts. (Civ. Code, § 1643; other citations omitted.) ' "That a greater degree or amount of certainty is required in the terms of an agreement which is to be specifically executed in equity than is necessary in a contract which is the basis of an action at law for damages" has often been declared.' (*Long Beach Drug Co.* v. *United Drug Co., supra* [13 Cal.2d 158] at p. 164, . . .) [¶] In order for a court of equity to decree that an obligation is specifically enforceable the terms of the contract must be complete and certain in all particulars essential to its enforcement. (*Magna Dev. Co.* v. *Reed,* 228 Cal.App.2d 230, 235-236 [39 Cal.Rptr. 284] . . .; Civ. Code, § 3390, subd. 5.) The agreement must not only contain all the material terms but also express each in a reasonably definite manner. (*Spellman* v. *Dixon,* 256 Cal.App.2d 1, 3 [63 Cal.Rptr. 668]; *Magna Dev. Co.* v. *Reed, supra.*) These principles have been repeatedly applied to deny specific performance of agreements which are incomplete, indefinite or uncertain with respect to the terms of payment of deferred balances or the terms of encumbrances representing such deferred balances. [Citations.] Recently these principles have been applied in denying specific performance to subordination agreements when the subordination provisions have been found uncertain and incapable of ascertainment by reference to an objective standard. (*Handy* v. *Gordon,* 65 Cal.2d 578 [55 Cal.Rptr. 769, 422 P.2d 329]; *Spellman* v. *Dixon, supra,* 256 Cal.App.2d 1; *Stockwell* v. *Lindeman,* 229 Cal.App.2d 750 [40 Cal.Rptr. 555]; *Magna Dev. Co.* v. *Reed, supra;* . . . .)" (*Id.,* pp. 761-762.)

Having set forth the foregoing principles, the court continued, "In the instant case the trial court was clearly, and with good reason, concerned about the ambiguity of the operation of the release clause. Plaintiffs had asserted in open court that the word 'contiguous,' as used in the release clause, gave them the unrestricted 'right to select for release a piece of property that merely touches' and hence they could take that portion of the property suitable for development and leave defendants with the hills and gullies. Plaintiffs argued below and argue here that the word 'contiguous' is fundamentally certain in meaning and that, therefore, the

agreement is not void for indefiniteness and uncertainty. Plaintiffs cite *Ganiats Constr., Inc. v. Hesse,* 180 Cal.App.2d 377, 385 [4 Cal.Rptr. 706], wherein the court said that ' "contiguous" realty need have only a minimum common boundary with the adjacent property' as authority for the proposition that the word 'contiguous' is fundamentally certain in meaning. However, in *Ganiats* the appellate court also said (pp. 384-385) in considering an option giving the optionee the right to purchase 10 acres of property and thereafter upon certain terms and conditions the 'next contiguous thirty (30) acres;' thereafter upon further terms and conditions the 'next contiguous seventy (70) acres' and the 'next contiguous one hundred twenty (120) acres:' 'The reference to the acreage in the designation "the next contiguous thirty acres" is not in itself a self-sufficient description. An acre is "[a] quantity of land containing 160 square rods of land, in whatever shape." (Black's Law Dict. (4th ed. 1951), p. 42.) An acre can be a circular, square, triangular, irregular, broad or narrow strip of land. Indeed, an acre is not a concrete form; it is a term of quantity and it can be applied to land in all manner of patterns.

" 'As we shall point out *infra* in more detail, the crucial term "next contiguous thirty acres" does not in itself specify the area covered by the option. In the first place the contiguity of *one acre* "next" to the westerly boundary would literally suffice to fulfill the definition, leaving open and unspecified the location of the remaining acreage. Even if we place all the 30 acres as close to the westerly boundary as possible: that is, the maximum number of acres adjacent to the westerly line, the remaining acres of the area may still take various forms or shapes, and the location of the easterly boundary remains indefinite.' In the case at bench the release clause was even more indefinite and uncertain; it provided only that any parcel of property no smaller than a certain number of acres released must be contiguous to that previously released." (*Id.,* pp. 762-763.)

It concluded, "While plaintiffs may be technically correct in asserting that the word 'contiguous' is certain in meaning, it is apparent that the word, as used in this release clause, renders the release clause uncertain and unreasonable *in equity* on the ground that the provision placed the sellers in a position where they could be deprived of all the choice land without adequate protection that they would ever be compensated by the buyer for the remainder. (See *Handy v. Gordon, supra,* 65 Cal.2d 578, 581; cf. *Magna Dev. Co. v. Reed, supra,* 228 Cal.App.2d 230, 243-244.)" (*Id.,* at p. 763, italics added.) At this point we note that the two cases

relied upon involved attempts to enforce executory contracts for the sale of real property rather than an executed agreement, as is involved in this case; and that each involved a subordination agreement.[15]

The court, having found that equitable relief was not available, then proceeded to demonstrate that such a conclusion did not give the sellers a right to rescind the contract. It stated: "The fact that the release clause is not sufficiently certain for specific performance does not, however, require us to invalidate the entire agreement. (See *Norris* v. *Lilly,* 147 Cal. 754, 756-757 [82 P. 425]; *Schomaker* v. *Osborne,* 250 Cal.App.2d 887, 893 [58 Cal.Rptr. 827]; *Brooks* v. *Allard,* 244 Cal.App.2d 283, 290-291 [53 Cal.Rptr. 82]; *Leider* v. *Evans,* 209 Cal.App.2d 696, 699-701 [26 Cal.Rptr. 123])" (*Id.*) It continued: "Defendants' reliance upon *Spellman* v. *Dixon, supra,* 256 Cal.App.2d 1, and *Magna Dev. Co.* v. *Reed, supra,* 228 Cal.App.2d 230, for the proposition that the uncertainty of the release clause renders the entire transaction void is misplaced for the reason that in the instant case the escrow had closed, the grant deeds and trust deed were recorded, and thus the agreement had been executed. [Citations.] Defendants concede, and the trial court found, that the escrow properly closed. The sale was thus complete at that moment. Since the property sold was described with detailed certainty, the agreement to convey the realty was not incomplete. [Citations.]

"The plaintiffs here, unlike the plaintiffs in *Spellman* and *Magna,* were not attempting to have the court decree that a contract existed, but were merely attempting to enforce the release clause provision. While the uncertainty of the release clause precludes specific performance of the provision, the contract was nevertheless certain enough to bind defen-

[15]*Magna Development Co.* v. *Reed,* however, is paginated to that portion of the opinion which found the release clause involved was not uncertain as a matter of law, nor uncertain or unreasonable in equity. More to the point is *White Point Co.* v. *Herrington* (1968) 268 Cal.App.2d 458 [73 Cal.Rptr. 885], an opinion not yet final at the time of the decision in *Lawrence* v. *Shutt.* There the court applied the principles developed in the subordination cases concerning the impairment of security and denied specific performance of an executory contract of sale which merely provided, "This note to have Release Clause attached providing for partial releases at $3000.00 per acre." (See Civ. Code, § 3391, subd. 2; and part V below.) There again, however, the agreement was executory rather than executed, and so far as appears no consideration had been paid to the sellers.

We also note at this point that *Ganiats Construction, Inc.* v. *Hesse* (1960) 180 Cal.App.2d 377 [4 Cal.Rptr. 706], which was extensively quoted in *Lawrence* v. *Shutt,* involved an option agreement, executory in nature. The court stated at the conclusion of the opinion: "Since the judgment requires respondent to return the total amount of the monthly payments paid by appellant pursuant to the extension of the agreement of August 29, 1952, no unjust enrichment accrues to respondent." (180 Cal.App.2d at p. 393.)

dants to the obligation. (*Schomaker* v. *Osborne, supra,* 250 Cal.App.2d 887, 893; *Eastwood Homes, Inc.* v. *Hudson,* 161 Cal.App.2d 532, 540 [327 P.2d 29]) ' "The law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained." ' (*California Lettuce Growers, Inc.* v. *Union Sugar Co.,* 45 Cal.2d 474, 481 [289 P.2d 785, 49 A.L.R.2d 496], quoted in *Ontario Downs, Inc.* v. *Lauppe,* 192 Cal.App.2d 697, 703 [13 Cal.Rptr. 782])" (269 Cal.App.2d at pp. 763-764.)

The court found that the sellers did not have grounds for rescinding the escrow because of mistake, and that there was no evidence that the original price for the land was not fair. (*Id.,* pp. 764-766.) It seized on the buyers' willingness to retain title to the property, without the benefit of the release clause in the event it was found unenforceable, and, in reversing the judgment, remanded the case with directions to the trial court to take further proceedings to effect that result.

On analysis, *Lawrence* v. *Shutt* does not demonstrate that a clause giving the buyer a right to select property for release bestows no rights on that buyer, even though it may be unenforceable in equity. (See part V below.)[16] In *Long Beach Drug Co.* v. *United Drug Co.* (1939) 13 Cal.2d 158 [88 P.2d 698, 89 P.2d 386], the court reversed an injunction against the wholesaler's violation of an exclusive sales agreement because equitable relief was improper when specific performance could not be ordered (13 Cal.2d at pp. 168-172). On rehearing, however, the court suggested the plaintiff amend to recover damages at law (*id.,* at pp. 172-174). The applicability of *Spellman* v. *Dixon* (1967) 256 Cal.App.2d 1, and *Magna Development Co.* v. *Reed, supra,* 228 Cal.App.2d 230, is expressly dispelled by the executory nature of the contracts involved in those cases. *Stockwell* v. *Lindeman, supra,* 229 Cal.App.2d 750, cited among the subordination cases in which specific performance was

---

[16]Professor Hetland, who is named as of counsel for the partially successful purchasers in *Lawrence* v. *Shutt,* has warned that release clauses which allow the buyer to select property at a fixed rate per lot or per acre, as in *Magna Development Co.* v. *Reed* (1964) 228 Cal.App.2d 230 [39 Cal.Rptr. 284], and *Conley* v. *Poway Land & Inv. Co.* (1965) 232 Cal.App.2d 22 [42 Cal.Rptr. 636], are of doubtful effectiveness in view of *Lawrence* v. *Shutt,* and *White Point Co.* v. *Herrington, supra,* 268 Cal.App.2d 458. (See Hetland, Secured Real Estate Transactions (Cont.Ed.Bar 1974) §§ 10:16 and 10:17, pp. 248-250; and Hetland, Cal. Real Estate Secured Transactions (Cont.Ed.Bar 1970) §§ 5.26-5.27 and 5:30-5:32, pp. 223-224 and 225-228.) Those cases were not decided until many months after the agreement and deed of trust under review were drafted. As we conclude above, the principles of *Lawrence* v. *Shutt* may operate to preclude the remedy of specific performance but they do not affect the validity of the release clause, or absolve the seller of all responsibility for its breach.

denied, in fact reversed a judgment in which the buyer sought damages after the seller refused to perform a contract for the sale of land. The court stated with respect to the agreement, "The legal effect of this paragraph is to delegate to the buyers the task of dividing the property into the three parcels and to supply the escrow agent with the descriptions for insertion in the trust deeds. Imprudent as such a delegation to buyers may appear, it does not render the agreement of the parties void for uncertainty. It leaves nothing to subsequent agreement between the parties. Their understanding is definite and enforceable and simply stated means—the buyers are to divide the property into three parcels as they see fit and are to secure the balance of the purchase price by the three notes and trust deeds on the parcels in the amounts indicated and with the sole qualification that the largest loan of $14,600 be secured by the 'most northerly portion of said land.' It may be assumed the seller had confidence that the property would be divided by the buyers into three parcels in a fair and reasonable manner and one which would fit in with buyers' plans for development of the property. The court should accord an interpretation which is reasonable (Civ. Code, § 1643) and which gives effect to the intent of the parties as it may be interpreted from their entire agreement rather than one which renders their contract void. (Civ. Code, §§ 1650, 1652, 1655, 1656.) Any fraud on the part of buyers in dividing the property would give rise to a cause of action by seller." (229 Cal.App.2d at pp. 754-755.) In regard to the subordination agreement, the court opined: "Again, while it may seem imprudent or poor business for the seller to agree that the buyers may arrange with the lender, whoever it might be, for the remainder of the terms of the construction loans, so long as principal and interest do not exceed the maximums agreed upon, it is not the function of the court to remake the contract between the parties if the terms are clear and certain. Here, again, there is nothing left for future agreement between the seller and buyers. In effect, the seller states that whatever terms of repayment the lender may require which are satisfactory to the buyers are acceptable to the seller. It is noted that, in the most crucial areas of the maximum amounts of construction loans and of interest rates, the seller has fully protected herself and as to the other details we must assume from their agreement she is content to allow buyers to contract with lenders for new construction loans as they see fit and that whatever serves their interests will not adversely affect her own." (*Id.,* p. 755. See also *Thompson* v. *Thompson* (1919) 43 Cal.App. 588, 590 [185 P. 427].) So here the buyer claims the seller made his bargain and must perform it despite the depreciation in the value of the property, which is discussed below.

The cases cited in *Lawrence v. Shutt* for the proposition that the agreement is not invalidated because it cannot be specifically performed demonstrate that the buyer has legal rights here. In *Norris* v. *Lilly* (1905) 147 Cal. 754 [82 P. 425], the trial court granted cancellation of deed which had been given in return for an oral promise to provide support and maintenance on the theory that since such an agreement could not be specifically enforced it was void. The court on appeal reversed the case for further proceedings, because part performance of the agreement may have supported the transfer. In so doing, the court pointed out, "The mere fact that a contract is not specifically enforceable does not render it either void or voidable. . . . In the very case here pleaded, if the defendants, after the payment of this money, and after years of personal service, had refused to proceed further with the contract, plaintiff unquestionably would have been entitled to rescind, but in rescinding the court in equity would take cognizance of the value of the services rendered and the moneys paid, the value of the occupation of the land by the promisors, and reach its conclusion under the evidence as to the terms upon which a cancellation of the deed should be decreed." (147 Cal. at pp. 756-757.) In *Schomaker* v. *Osborne* (1967) 250 Cal.App.2d 887 [58 Cal.Rptr. 827], the court reversed a judgment which had refused to grant specific performance following the buyer's attempt to exercise an option to purchase. The court observed, "The necessity of future agreement on limited phases of the transaction does not prevent birth of a binding contract upon acceptance since, if the parties cannot agree on those phases, each may force the other to accept the determination of a court of equity. [Citations.]" (250 Cal.App.2d at p. 893.)

In *Brooks* v. *Allard* (1966) 244 Cal.App.2d 283 [53 Cal.Rptr. 82], the court reversed a judgment for specific performance because the description of a plat to be excepted and reserved from a general description of the property was uncertain (244 Cal.App.2d at pp. 284-288. See also *Brudvig* v. *Renner* (1959) 172 Cal.App.2d 522, 524 [342 P.2d 276]), and because the evidence failed to sustain a finding that the seller had approved a survey of that plat. (244 Cal.App.2d at pp. 288-290.) It found reason to believe the buyer might accept a survey including an additional six and one-half acres which was satisfactory to seller, and gave him an opportunity to consent to a modification of the judgment accordingly (*id.,* pp. 290-291). It ruled that if the buyer failed to accept the modification he should be remitted to his right to recover damages, since he had paid $30,000 to the seller on the contract (*id.,* p. 292). In *Leider* v. *Evans* (1962) 209 Cal.App.2d 696 [26 Cal.Rptr. 123], the same court as decided *Brooks* v. *Allard* had reversed a judgment denying specific

performance of an option agreement. The court found the buyer was willing to accept any description of a reserved two acres proposed by the sellers. It indicated, under those circumstances, "If defendants refuse to accept plaintiff's proposed description and refuse to propose one of their own, the court has the power to compel them to do so." (209 Cal.App.2d at p. 699. See also *City of Los Angeles* v. *Superior Court* (1959) 51 Cal.2d 423, 433 [333 P.2d 745]; and *Ontario Downs, Inc.* v. *Lauppe, supra,* 192 Cal.App.2d 697, 704-705.)

*Leider* v. *Evans, supra,* also lays down the following test for certainty of description: "It has often been stated that one of the tests for determining the sufficiency of a description is whether a competent surveyor would have any difficulty in locating the land and establishing its boundaries from the description contained in the agreement to convey. [Citations.]" (209 Cal.App.2d at p. 703. See also *Calvi* v. *Bittner* (1961) 198 Cal.App.2d 312, 316 [17 Cal.Rptr. 850].) There, as in this case, a surveyor had produced a sketch and a legal description of the two acre parcel involved, embracing the criteria and objects referred to in the option agreement. The court concluded: "It is evident that the surveyor above referred to had no such difficulty and, if defendants are unwilling to accept his survey, they should furnish one of their own." (*Id.*)

Finally, we note the construction placed on the clause by the seller herself. (See *Chapman College* v. *Wagener* (1955) 45 Cal.2d 796, 802-803 [291 P.2d 445]; and *Long Beach Drug Co.* v. *United Drug Co., supra,* 13 Cal.2d 158, 166-167.) When confronted with the buyer's demand for a partial reconveyance of 241 acres she did not claim, as she was later to claim in her answer filed September 17, 1974, that the release clause was unenforceable, or, as she claimed in an amended answer filed July 24, 1975, that the clause violated the statute of frauds. (Civ. Code, § 1624.) Her letter of March 18, 1974, indicated that a release of the 241 acres had been authorized on condition that the buyer pay up the delinquent taxes and assessments, reserve to the seller an access to the remaining land from Page Mill Road, and adjust the acreage to compensate for the improvements on the land selected, or select other land. (See fn. 9, above.)

So in this case we conclude that the release agreement was not invalid because of uncertainty. ■ If the seller is entitled to be relieved from specific performance of the release agreement it must be because (1) the buyer's demand was not in accordance with the terms of the agreement (cf. *Hiller* v. *King* (1951) 105 Cal.App.2d 181, 194-195 [232 P.2d 905]); or

(2) because it would not be just or reasonable to specifically enforce the agreement (Civ. Code, § 3391, subd. 2; see part V *infra*); and, in the latter event, the buyer should be entitled to restitution or damages (see part VI *infra*).

Since the trial court did not rule upon the propriety of the seller's original specific objections to the buyer's request for a partial release we do not deem it appropriate to evaluate that request in the light of the counteroffer. It would appear, however, that since no taxes and assessments had been paid by anyone since April 1970, that the reimbursement noted in *Sacramento S. F. L. Co.* v. *Whaley, supra,* 50 Cal.App. 125, was not necessary. A strict application of the holding of that case would indicate that every time $3,000 was paid there was an equitable conversion of one acre which would not be defeated by a subsequent default. Nevertheless, there may be some merit to the contention that there could be no equitable conversion by payment of principal when delinquencies existed to the extent such funds were necessary to pay the delinquencies.

The question of whether the release agreement contemplated that the "easement, right of way meeting official requirements or dedicated street" which was to afford ingress and egress to the remaining land was to be carved out of the property released, or whether existing dedicated streets no matter how difficult of access, would suffice is one which only can be resolved on the basis of the whole record.

The original draft of the agreement dated March 5, 1968, provided for the release clause in paragraph 10. By amendments dated March 5, 1968, a minor amendment adding "meeting official requirements" was made to that paragraph. At the same time three new paragraphs were added to the original draft. These paragraphs respectfully recited that the seller allocated the sum of $97,500 for the seven-acre parcel which with improvements constituted her residence property, reserved to seller the occupancy of those premises until April 20, 1968, as a tenant, and provided for an advance of $125,000 from buyer to seller. It would appear as suggested by the buyer that the first of those paragraphs was inserted to establish a sales value of the improvements for tax purposes. (See *White Point Co.* v. *Herrington, supra,* 268 Cal.App.2d 458, 467.) It seems that the amendments to paragraph 10 would have included specific reference to the seven-acre parcel if it were intended to create an exception to the general language contained therein, and that it would thereafter have been inserted in the deed of trust.

In any event, if the counteroffer be deemed correct, the discrepancies between it and the original request were not so serious in view of the overall amount involved, that they could not have been adjusted by the trial court, within principles reviewed above, in resolving the differences of the parties, had there been no other defects in the request.

V

Insofar as is pertinent here, section 3391 of the Civil Code provides: "Specific performance cannot be enforced against a party to a contract in any of the following cases: [¶] 1. If he has not received an adequate consideration for the contract; [¶] 2. If it is not, as to him, just and reasonable; . . ." No contention is made that the consideration fixed as the purchase price of the land, or the release price of $3,000 per acre was not adequate at the time the agreement was entered into in 1968. The difficulties arose because development on a scale which was foreseeable in 1968 was frustrated by subsequent rezoning, that in turn depreciated the value of the property.

The court, after viewing the property, made extensive findings on the issue of whether the enforcement of the release clause as requested by the plaintiff buyer would be just and reasonable. It found that the buyer hired an engineer to define by survey 241 acres for release, representing the number of acres at $3,000 per acre for the aggregate of $725,000 principal which the buyer had paid in the five years from March 15, 1968, through March 15, 1973. In selecting the acreage for release, the survey included real property consisting primarily and almost wholly of land remote from the 150 acres originally purchased by plaintiff which was free and clear of the deed of trust. The two parcels were connected by a narrow corridor of land having a varying width of 100 to 400 feet.

The property selected for release consisted of all of the remaining property bordering Page Mill Road, historically the access to said ranch. It further included ranch headquarters, storage buildings, barn, guest pavillion and substantially all of the physical improvements. The bulk of said 241 acres selected for release consisted of most of the developable lands for residential homesites, including both sides of Montebello Ridge which is the view property to the east overlooking Santa Clara Valley and west to the mountains. It is a crest in the Santa Cruz mountain range. The property selected for release is further in close proximity to the water utilities and has good access to Page Mill with an existing roadway located thereon and known as Montebello Ridge Road.

If the property were released, the defendant would have been left with 359 acres located in the southwesterly portion of the 750 acres. This property consists primarily of steep slopes and a canyon with very little developable area for residential homesites. While there is some frontage to the remaining 359 acres along Skyline, for all practical purposes, the defendants would be unable to develop access to the major portion of the remaining property. If access could be developed, it would only serve the extreme southwest portion of the property and only a small portion of the acreage. The cost to gain access to the balance of the property would be at most, difficult, expensive, and based upon the evidence present, which is uncontroverted, would be, for all intents and purposes, impractical. In addition, release of the 241 acres would cut off access to the existing water and sewer lines.

The plaintiff selected substantially the most intrinsically valuable property, leaving the defendant security on 359 acres that are largely inaccessable, largely undevelopable and, as a result, the fair market value of the remaining security would be substantially less than the balance of $725,000 plus interest due on the outstanding promissory note. If such a release were allowed, the plaintiff's security for the promissory note would be nominal, and in light of the fact that the court finds that said deed of trust is a purchase-money deed of trust, the defendant's ability to receive the purchase price that he bargained for would be seriously jeopardized. The value of the remaining 359 acres becomes even more acute by reason of the actions of the City of Palo Alto which has greatly diminished the market value of the property which, prior to down zoning, had been valuable for development into residential estates as evidenced by the sales price between plaintiff and defendant that was agreed upon in 1968.

From the foregoing facts the court made the following mixed findings of fact and conclusions of law: "[T]he property so selected is not within the sense and spirit of release clause by any reasonable interpretation"; . . . "[T]he court finds that the plaintiff's requests for release is unconscionable, inequitable and totally unfair to the defendant." It concluded: "That plaintiff attempted to exercise the release provision in an inequitable and unconscionable manner, which severely prejudiced the security of the defendant." The judgment, as we have noted, denied plaintiff buyer any relief at all.

In *Handy* v. *Gordon, supra,* 65 Cal.2d 578, the court affirmed a judgment on the pleadings for the defendant seller in an action in which

the contracting buyer sought specific performance because the contract was not just and reasonable. The court laid down the following rules: "Although the parties to a contract of sale containing a subordination clause may delegate to the vendee or third party lenders power to determine the details of subordinating loans, an enforceable subordination clause must contain terms that will define and minimize the risk that the subordinating liens will impair or destroy the seller's security. [Citations.] Such terms may include limits on the use to which the proceeds may be put to insure that their use will improve the value of the land, maximum amounts so that the loans will not exceed the contemplated value of the improvements they finance, requirements that the loans do not exceed some specified percentage of the construction cost or value of the property as improved, specified amounts per square foot of construction, or other limits designed to protect the security. Without some such terms, however, the seller is forced to rely entirely on the buyer's good faith and ability as a developer to insure that he will not lose both his land and the purchase price. Even if we were to assume that a contract of sale contemplating subdivision by the vendee is sufficiently different from the usual land sale contract to take it out of the operation of the anti-deficiency legislation [citations], the personal liability alone of the vendee would not constitute sufficient protection to the vendor to permit specific performance. [Citations.]" (65 Cal.2d at p. 581. See also *Spellman* v. *Dixon, supra,* 256 Cal.App.2d 1, 3-4; and *Magna Development Co.* v. *Reed, supra,* 228 Cal.App.2d 230, 235-242. Cf. *Stockwell* v. *Lindeman, supra,* 229 Cal.App.2d 750, 755-758.)

In *White Point Co.* v. *Herrington, supra,* 268 Cal.App.2d 458, the court purported to rely on uncertainty (Civ. Code, § 3390, subd. 5) in reversing a judgment for specific performance of an alleged agreement for the purchase and sale of property which contemplated a release clause for "partial releases at $3000.00 per acre." (268 Cal.App.2d at pp. 465-468.) The language in the opinion, however, refers to the analogy between release clauses and subordination agreements, and sets forth how an unconditional release clause may impair the seller's security (*id.,* pp. 466-467). As we have seen (part IV above) in *Lawrence* v. *Shutt, supra,* 269 Cal.App.2d 749, the principles developed in connection with the subordination agreement were applied to preclude specific performance of a release clause in an executed contract for purchase and sale (269 Cal.App.2d at pp. 760-763).

The buyer has not questioned the factual findings of the court as set forth above. The foregoing precedents clearly sustain the trial court's

findings and conclusions that it would be improper to grant plaintiff specific performance of the release of the property requested in his demand of February 9, 1974.

## VI

We have been referred to no subordination case in which the contract was duly executed, consideration paid to the seller, and a demand made at a subsequent date. In the cases cited above the sellers sought to rescind the executory agreement, and the consideration, where received, was tendered or returned to the buyer. In *White Point Co.* v. *Herrington, supra,* 268 Cal.App.2d 458, the contract was executory and apparently no payment had been made and accepted. In *Lawrence* v. *Shutt, supra,* 269 Cal.App.2d 749, the contract was executed by payment of the down payment of $250,000. The trial court had ordered that payment restored to the buyers on finding the seller was entitled to rescind. The court on appeal avoided any such question because it found the buyer was willing to proceed without any release clause or any conditions other than an accounting for the loss of use of his money. That question was referred back to the trial court. (*Id.,* pp. 766, 767.)

Here we are faced with a buyer who has paid in one-half of the balance due on the purchase price of 600 acres, and who by reason of an agreement entered into in 1968 believed he was entitled to a release and reconveyance from the trustee of 241 of those acres. The judgment of the trial court apparently forfeits all of the rights the buyer expected to enjoy under the release clause, and unduly enriches the seller by giving him 241 extra acres as security for the balance of the purchase price which became delinquent.

In closing argument counsel for the plaintiff stated, "Your Honor, if we didn't draw that line just right, the plaintiff should have the line redrawn. But I submit there is no basis for it. There is no evidence in the record to support that. [¶] But surely, if the Court finds that relief can only be afforded the plaintiff if he consents to some modification, the plaintiff will consent. That's doing equity. That's what we understand the law of equity to be."

Following the court's oral announcement of its decision, which is closely followed in the findings of fact and conclusions of law, the plaintiff caused to be prepared an amended demand for partial

reconveyance designating 240 acres immediately adjacent to the 150 acres conveyed free of lien at the time of the execution of the original contract, which new acreage included a substantial part of the acreage which had been criticized as leaving the defendant with inadequate security, and excluded most of the acreage which defendant's testimony showed to be the most valuable acreage. The plaintiff further commenced proceedings to redeem the entire property from the tax sale, and to determine the amount of the special assessments as finally levied by the city. He moved the court to reopen the proceedings to consider the foregoing and to prevent a forfeiture by either approving the revised request for a partial reconveyance, or by decreeing that he was entitled to the return of the consideration paid for that acreage, with a lien upon the property superior to the deed of trust for the repayment of that sum. He also sought consideration of the respective rights of the parties to the claims made in the pending inverse condemnation action against the City of Palo Alto.

The court denied the motion to reopen. The findings of fact contain the following recitals:

". . . In addition, the Court finds that at no time prior to trial did the plaintiff even offer rights of access to the defendants from Page Mill Road across the property selected for release."

"Plaintiff, subsequent to the trial, filed a motion requesting the court to approve a release of 241 acres consisting of property of different acreage. The court finds that in view of the diminution in value of the property as a whole, the substantial nature of default by plaintiff which still exists in the form of non-payment of taxes, assessments and payments of principal and interest on the promissory note and the further long-standing request of plaintiff to insist upon a release of the original 241 acres that he desired to select, it would be prejudicial to the rights of the defendant to allow a release of any portion of the subject property at the present time. The court, in this capacity, is exercising its equitable powers and considers the actions of the plaintiff with regards to the most recent request for a different release of acreage to be untimely and, as a result, the court finds that plaintiff is guilty of laches."

"The court finds that the plaintiff has chosen to stand on the contract as opposed to seeking the relief of restitution for the purchase price and thus has elected his choice of remedy."

In concluding that the buyer was entitled to no relief, the court stated in its conclusions of law: "That plaintiff is denied restitution of any amounts including monies paid towards the purchase price, together with interest thereon, . . ."; and "[¶] That the plaintiff shall not be entitled to request an alternative release of acreage as such relief would be inequitable to the defendant and that, further, plaintiffs actions heretofore amount to laches."

The decision generally follows that in Shakespeare's "Merchant of Venice."[17] The plaintiff, having demanded his pound of flesh is denied all relief and his payments are forfeited. Underlying that determination are two concepts. First, that the buyer-debtor takes the risk that the land, standing as security for the balance of the purchase price, will depreciate in value in the event of a rezoning. (See *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 521 [125 Cal.Rptr. 365, 542 P.2d 237] [cert.den. (1976) 425 U.S. 904 (47 L.Ed.2d 754, 96 S.Ct. 1495)].) ▮ On the other hand, it is clear that when the depreciation of the value of the security is occasioned, not by waste committed by the buyer-debtor, but by a general or local depression of property values, the buyer-debtor is to be protected. It was so noted in *Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35 [27 Cal.Rptr. 873, 378 P.2d 97], in upholding the provisions of section 580b of the Code of Civil Procedure. The court stated: "If inadequacy of the security results, not from overvaluing, but from a decline in property values during a general or local depression, section 580b prevents the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability." (59 Cal.2d at p. 42. See also, *Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 601 and 603-605 [125 Cal.Rptr. 557, 542 P.2d 981]; and *American Sav. & Loan Assn.* v. *Leeds* (1968) 68 Cal.2d 611, 615 [68 Cal.Rptr. 453, 440 P.2d 933].) ▮ If under the facts of this case the purchase money lender entered into a bargain whereby she was satisfied to have the security of 359 acres after half the balance of the purchase price was paid, she cannot be given greater rights because circumstances beyond the control of both buyer and seller rendered those acres, and, as well, the acres subject to release at $3,000 per acre, of less value at the time of the default. There is no warrant for arbitrarily shifting all of the depreciation in the market value of the property from seller to buyer by enhancing the former's security.

---

[17]Portia: "Thou shalt have nothing but the forfeiture to be so taken at thy peril . . . ." (Act. IV, scene 1, 11, 339-340.)

█ A second concept is that the buyer should be left without recourse because he fails to come into court with clean hands. The seller relies upon principles expounded in *Precision Co.* v. *Automotive Co.* (1945) 324 U.S. 806 [89 L.Ed. 1381, 65 S.Ct. 993], as follows: "The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.' *Bein* v. *Heath*, 6 How. 228, 247. Thus while 'equity does not demand that its suitors shall have led blameless lives,' *Loughran* v. *Loughran*, 292 U.S. 216, 229, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. [Citations.] [¶] This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' *Keystone Driller Co.* v. *General Excavator Co.*, *supra* [290 U.S. 240] 245, 246. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor." (324 U.S. at pp. 814-815 [89 L.Ed. at p. 1386]. See also 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, §§ 8 and 9, pp. 5233-5235.) In the principal case the court noted "The history of the patents and contracts in issue is steeped in perjury and undisclosed knowledge of perjury." (324 U.S. at p. 816 [89 L.Ed. at p. 1387].) The examples cited by the learned commentator in section 9 are similarly marked by extrinsic misconduct affecting the litigant's claim. In this case, on the other hand, the buyer appropriately has sought vindication of his contract rights in judicial proceedings. We believe this case is governed by principles expounded in *Schomaker* v. *Osborne*, *supra*, 250 Cal.App.2d 887. There the court ruled that the lessee-buyer seeking specific performance of an option to purchase had erred in contending he was not required to compensate the lessor-seller for certain improvements on the property. The court observed and ruled, "They were not guilty of bad faith, because they maintained their expectations of contract fulfillment according to the contract as they

conceived it. They were not required to surrender to all the seller's demands at the peril of forfeiture. A party who acts in good faith may claim a contract construction more favorable to him than the contract will ultimately bear; judicial rejection of his claim does not preclude relief unless the other party is prejudiced by the change or reduction in the claim." (250 Cal.App.2d at pp. 894-895.)

■ There are, however, statements in the cases we have reviewed which tend to support the trial court's decision. In *Conley* v. *Poway Land & Inv. Co., supra,* 232 Cal.App.2d 22, the buyer contended that the lower court had caused a forfeiture of property, allegedly erroneously released to it, by rescinding the transaction and that it should have allowed the buyer relief by permitting it to pay the total shortage of $971.40, which should have been paid before default to warrant the conveyance of the full 50.27 acres received. The court stated: "Appellants maintain that the judgment of the trial court results in a forfeiture which the law abhors. But in making this argument, we feel that appellants misapply the term 'forfeiture.' . . . [¶] The judgment of the trial court did not amount to an all-time loss of the 38 acres to Poway. It merely returned this property to the status of unredeemed property under the deed of trust redeemable by said trustor upon the curing of its default." (232 Cal.App.2d at p. 26.) Since in that case the court ordered release of so much of the land as was actually covered by payments before default, the language can only refer to the excess land for which payment had not been made while the trustor was "not in default" as required by the release clause.

In *Lawrence* v. *Shutt, supra,* 269 Cal.App.2d 749, the buyers sought specific performance of the release clause, a declaration of the rights and obligations of the parties under the release clause, and to quiet title to the property for which the release was demanded. After the buyer indicated a willingness to retain title without the release clause if it proved unenforceable, the court stated, "In order to obviate any concern that plaintiffs might, at retrial, ask leave to amend to rescind this transaction, we hold that they are estopped to change their remedy to rescission by their original election to seek specific performance of this release clause. Plaintiffs have clearly manifested an intention to pursue one of two inconsistent remedies, and such a change obviously would operate to defendants' prejudice in view of the lapse of time. (*Ferguson* v. *Fajardo,* 211 Cal.App.2d 119, 121 [27 Cal.Rptr. 72]; citing 1 Witkin, Cal. Procedure (1954) § 51, p. 548.)" (269 Cal.App.2d 749, 766-767.)

In our opinion this is an exceptional application of the election of remedies, only warranted by the fact that the plaintiffs having been awarded rescission, and having successfully appealed from that judgment by representing that they would accept a conveyance without a release clause, should not be permitted to return to the posture they once enjoyed and rejected. The prejudice to the defendants (sellers) by lapse of time above is of questionable significance. If there were a return to rescission the delay would be no more than if the judgment had been affirmed on appeal. The precedents cited do not establish that the buyer in this case should have all his rights forfeited and be estopped to claim that the seller is unduly enriched. In *Ferguson* v. *Fajardo* (1962) 211 Cal.App.2d 119 [27 Cal.Rptr. 72], the court pointed out that the doctrine of election of remedies depends on estoppel. The court found that even though the defaulting seller made improvements to the premises after the buyer sued for damages, the latter was not precluded from amending to seek specific performance over two years later, because the court could and did amply compensate the seller for such improvements. (211 Cal.App.2d at pp. 121-122.) The commentator relied upon states in a later edition, "The doctrine of election of remedies, often invoked in the earlier cases, has been repeatedly criticized and seems to be falling into disfavor. Late California decisions illustrating binding election are comparatively rare, and the bar to a remedy is sustained on the principles of estoppel or res judicata rather than election." (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 113, p. 982; and see passim §§ 112-129, pp. 980-1000).[18]

The contract here falls within the purview of *Long Beach Drug Co.* v. *United Drug Co., supra,* 13 Cal.2d 158. There the court after denying injunctive relief, on petition for rehearing, pointed out: "Although the equitable remedy is not available to plaintiff, nevertheless the contract sued upon is valid and sufficiently certain to warrant the trial court in entertaining a plea for the recovery of damages . . . . [¶] Under present code procedure, which permits a party to litigate his right to legal and equitable relief in the same action, and by amendment to ask a change of remedy, there appears to be no reason why plaintiff, if so advised, should

---

[18]In· *White Point Co.* v. *Herrington, supra,* where the contract was executory, the court, unlike the court in another district in the later case of *Lawrence* v. *Shutt, supra,* 269 Cal.App.2d 749, refused to accept the buyer's waiver of the release clause or prayer for an alternative to be drafted by the court or the seller. (268 Cal.App.2d 458, 468-469. See also *Spellman* v. *Dixon, supra,* 256 Cal.App.2d 1, 4-5 [waiver of subordination clause refused]; *Magna Development Co.* v. *Reed, supra,* 228 Cal.App.2d 230, 242-243 [*id.*].) In view of the executed nature of the contract here, those cases are deemed unpersuasive.

not apply for permission to amend its pleading. [Citations.]" (13 Cal.2d at p. 173.)

In view of the state of the law at the time the release clause was prepared we cannot fault the buyer for attempting to enforce the clause according to its literal terms.[19] It was not until after suit was commenced that the seller, who had previously demanded modifications of questionable nature under the terms of the agreement, first claimed an equitable defense as relieving her from the obligation to release 241 acres. The failure to offer rights of access from Page Mill Road across the property selected for release, if in fact intended by the parties and so determined by the trial court, could have been rectified by an appropriate provision in any judgment made by the trial court. It was not so momentous as to cause a forfeiture of all of the buyer's rights.

There is authority for the proposition that a motion to reopen a case can be granted only for good cause. (See *Ensher, Alexander & Barsoom* v. *Ensher* (1964) 225 Cal.App.2d 318, 326 [37 Cal.Rptr. 327].) It may be that the buyer should be precluded from introducing evidence of a post-decision tender to the seller of an alternate description for the acreage requested. Nevertheless, he was entitled to have the court consider his request for relief from forfeiture of both the property and the payments made. The court rejected the request for a consideration of alternative acreage as untimely and found the buyer guilty of laches. The record fails to warrant that finding or the conclusions predicated on it.

The pretrial conference order incorporates the parties' pretrial statements. The buyer alleged with respect to "Settlement Discussions." "Plaintiffs have offered to grant defendants additional access to public rights of way and utilities, have offered to negotiate a different description of the Monte Bello Ridge land selected for release and reconveyance, and have offered to negotiate an exchange involving land not even subject to the lien of defendants' deed of trust. Defendants and cross-complainants have declined all such offers, contending that they are legally entitled to foreclose and recapture the entire property and retain all sums paid by plaintiffs totalling over $1,640,000 because, notwithstanding retention of said moneys and defendants' acquiescence since 1968, they now contend that the release provisions of the deed of trust are 'unenforceable' but the rest of the provisions remain binding."

---

[19]Under the current state of our adversary proceedings and the developing malpractice litigation, could counsel safely do otherwise? To say that he forfeited all for his client by diligently asserting his rights is to but invite attack from another quarter.

There is nothing in the defendant's statement to contradict the foregoing or to indicate that the seller was other than adamant that it should retain both the property and the money paid in. At oral argument before the decision, the court asked: "Do you agree in entering into this discussion that since the Court has under its equitable power authority to make a determination to see whether the exercise is reasonable and equitable and fair to both parties?" Counsel for the buyer responded: "I believe it does. I believe a court of equity always has the power to make sure that justice is done, and that the parties are fair, yes. As a matter of fact, Your Honor, if we didn't draw that line just right, the plaintiff should have the line redrawn. But I submit there is no basis for it. There is no evidence in the record to support that. [¶] But surely, if the Court finds that relief can only be afforded the plaintiff if he consents to some modification, the plaintiff will consent. That's doing equity. That's what we understand the law of equity to be." In the light of the foregoing we cannot agree that the buyer was estopped to request the court to use its equitable powers to relieve him from forfeiture of both his land and money.

We conclude that the trial court erred in permitting the seller to foreclose on all 600 acres without making some provision to prevent the forfeiture of such rights as had accrued to the buyer prior to the default of March 15, 1974. The judgment must be reversed and the case remanded for further proceedings to that end.

As we view the equities in this case the first charge against the property was for taxes and assessments accrued and outstanding against the entire property on February 9, 1974, when the buyer made his demand, at the rates and with penalties and interest thereon, ultimately found payable to the taxing authorities to that date.

The second charge against the property is the accrued rights of the buyer under the release clause. These must be measured by 241 acres, or the consideration of $725,000 paid on account of the principal of the loan.[20] From such accrued rights there must be deducted, however, the sums indicated as a first charge. Although the inclusion of the taxes and assessments on all of the property is more than was tendered or required

---

[20]We reject the concept that the payments on principal after default in the payment of taxes and assessments should be first reduced by the payment of the sums so delinquent. No default was declared by the seller, and the buyer continued to make, and the seller accepted, the payments on the loan. Under these circumstances, the payments having been made at a time when the buyer believed he was acquiring a right to release acreage, the seller may be estopped to demand otherwise. (See *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 483 [289 P.2d 785, 49 A.L.R.2d 496]; and *Burgess* v. *California Mutual B. & L. Assn.* (1930) 210 Cal. 180, 186-188 [290 P. 1029].) Nevertheless, as we provide above, the amount of those taxes and assessments accrued prior to February 9, 1974, must be charged against the interest of buyer.

in *Sacramento S. F. L. Co.* v. *Whaley, supra,* 50 Cal.App. 125, we believe that the equitable principles reviewed in part V of this opinion require such an adjustment.

If the seller elects to pay the $725,000, as so reduced by the total amount of the taxes and assessments and interest due as of February 9, 1974, together with interest on the balance from that date, the sale may stand and upon payment of that sum, title to the 600 acres may be quieted in the seller who has purported to foreclose by private sale subject to the lis pendens in this action.

As an alternative the court, unless the parties agree otherwise,[21] may order the sale under the deed of trust to be set aside and order a resale of the property. In that event, after the payment of all accrued taxes and assessments and other necessary costs attendant to the maintenance of the property and the sale (exclusive, however, of any fees and costs in *Eldridge* v. *City of Palo Alto, supra,* 57 Cal.App.3d 613), the balance of the proceeds shall be divided in the proportion of 241/600 to buyer and 359/600 to seller. It is assumed that if the 359/600 would produce a surplus over the balance due under the deed of trust, the seller would elect the first alternative, and only elect this alternative so that both buyer and seller would share the loss from depreciation in the market value of the property. Otherwise, under ordinary principles of real property security the surplus would go to the buyer.

█ The seller may not be forced to accept 359 acres designated by the buyer or by the court, the buyer having indicated a willingness to accept the 241 acres as so determined. Nevertheless the seller, if she considers a sale for the benefit of both unfeasible, or is not prepared to make restitution as suggested above, may elect to accept such a designation. (See *Brooks* v. *Allard, supra,* 244 Cal.App.2d 283, 290-291. Cf. *Leider* v. *Evans, supra,* 209 Cal.App.2d 696, 699 [suggesting court can compel selection under other circumstances]; and *Ontario Downs, Inc.* v. *Lauppe, supra,* 192 Cal.App.2d 697, 704-705 [suggesting if selector waives right to designate parcel, and the other party refuses to approve or designate alternative, the court should approve a reasonable designation by original selector].) In this event, charges and taxes would have to be adjusted with respect to each parcel in accordance with the views expressed above, with any balance a lien on the property of the debtor.

---

[21]We take judicial notice of the records of this case which indicate in connection with a motion to expunge notice of pendency of action, there was in July 1977 a pending contract of purchase and sale between seller and Midpeninsula Regional Park District which was subject to resolution of this action; and that at the time the parties were attempting to consummate an agreement so that sale could proceed.

The foregoing solutions are not to be considered as exclusive, as it is properly the function of the trial court to provide an equitable resolution of the rights and obligations of the parties as we have expounded them herein. Nevertheless, in the interests of ending litigation, we give the seller the right to accept the first alternative within 30 days after the remittitur is filed with the trial court.

Since in our view of the record each party has been equally adamant in failing to recognize the equitable and legal rights of the other, no costs or attorneys' fees will be allowed either party on appeal.

The judgment is reversed and the case is remanded for further proceedings consistent with the views set forth in this opinion.

Racanelli, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied February 1, 1978, and the following opinion was then rendered:

THE COURT.—By her petition for rehearing respondent attacks the decision of the court in upholding the validity of the executed contract while acknowledging that she was entitled to some equitable relief; that is, rescission with return of the payments received, or substitution of some other interest in the land, if the purchase and sale was to persist. We adhere to our view that she was not, and is not, entitled to retain all the payments and all of the land.

She also seeks to secure a formulization of the equitable resolution of this case which the trial court has been directed to effect. The items to be considered will vary with the election that she makes. If a rescission is effected retroactive to February 9, 1974, the balance struck would bear interest at the legal rate. If she elects to share the net proceeds of the sale of the property, she is entitled to credit for the outlays made for taxes and expenses incurred in carrying the property since February 9, 1974, and in effecting the 1977 sale, with interest on those sums from the time expended. The source of those funds is of no consequence, and the plaintiffs and appellants are not chargeable with the interest she may have paid to secure the funds for those outlays. It would give respondent double recovery to credit interest on the expenditures, and also interest on the funds borrowed to make them. No other opinion is expressed as to the formulae proposed by the respondent. All the facts on which they are predicated are not in the record. The equitable solution should be determined in the first place, and hopefully decisively, by the trial court, on facts and principles to be presented there.

The petition of respondent Alyce Burns for a hearing by the Supreme Court was denied April 13, 1978.

[Crim. No. 29952. Second Dist., Div. Two. Jan. 3, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
FRED HARVEY, Defendant and Appellant.

**COUNSEL**

James Alle, under appointment by the Court of Appeal, for Defendant and Appellant.

Paul Halvonik, State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, and Tracy S. Rich, Deputy State Public Defender, as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FLEMING, Acting P. J.**—Death penalty case transferred from the Supreme Court[1] for modification of the sentence to life imprisonment in accordance with *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101]. The grand jury returned an indictment charging first degree murder of a police officer using a firearm; assault with a deadly weapon; kidnap; a second assault with a deadly weapon; robbery with a firearm; and attempted rape with use of a firearm. Two prior felony convictions were admitted. The court dismissed the robbery count (Pen. Code, § 1118.1), and the jury found appellant guilty of the

---

[1]By order dated 25 January 1977 in file.

remaining charges. In the special-circumstances phase of the cause the allegation of murder of a police officer was found to be true (Pen. Code, § 190.2), sentence of death was imposed on that count, and sentences on the remaining four counts were imposed consecutively to one another and to any sentence imposed on count I if the sentence of death were stricken.

Apart from his argument to modify the death sentence pursuant to *Rockwell*, appellant raises only issues of grand jury procedure: principally, that his accusation by grand jury indictment instead of by information was unconstitutional in that it denied him the fundamental right of preliminary hearing at a "critical phase" of the proceedings, in violation of due process and equal protection of law.

Since the facts are not relevant to the contentions on appeal, a brief outline will suffice. With his hair rolled in distinctive yellow plastic curlers, appellant accosted the kidnap victim at a busstop late at night, forced her at gunpoint to enter his vehicle, and then attempted to rape her in an open field. She escaped through a ruse, fled to a nearby friend's house, and called the police. While two officers were attempting to capture appellant in a lonely field near an oil tank in Signal Hill, appellant shot and killed Officer Birdsall. Shortly thereafter police officers captured appellant, still wearing the yellow curlers. The kidnap victim identified him at a line-up. His fingerprints were found on her driver's license, on a cookie wrapper from the lunch she had been carrying, and in the Oldsmobile station wagon she had been forced to enter. In the vicinity of the murder, a weapon, expended cartridges, and yellow curlers were found. Additionally, appellant made incriminating admissions during pretrial incarceration, such as, "I can't—they really got me because I really blew him up," and "Well, okay, I will stand in a lineup, because the only one that can identify me is dead, and he is a policeman." The foregoing facts demonstrate that the evidence supports the convictions, and appellant does not contend otherwise.

I

■ California courts have rejected appellant's argument that grand jury accusation without opportunity for preliminary hearing (Cal. Const., art. I, § 14) is unconstitutional. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 746-747 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *Newton* (1970) 8 Cal.App.3d 359, 388 [87 Cal.Rptr. 394].) The United States Supreme

Court has likewise rejected such arguments. (See *Goldsby* v. *United States* (1895) 160 U.S. 70, 73 [40 L.Ed. 343, 344-345, 16 S.Ct. 216]; cf. *Lem Woon* v. *Oregon* (1913) 229 U.S. 586 [57 L.Ed. 1340, 33 S.Ct. 783].) Although a minority of justices has expressed its reservations about grand jury accusation, (*Johnson* v. *Superior Court* (1975) 15 Cal.3d 248, 255-270 [124 Cal.Rptr. 32, 539 P.2d 792]), this court is bound to follow existing majority opinion and reject appellant's contention that grand jury accusation is unconstitutional.. (*People* v. *Superior Court (Persons)* (1976) 56 Cal.App.3d 191, 193-194 [128 Cal.Rptr. 314].)

■ Appellant claims the prosecutor suppressed evidence at the grand jury hearing. The assertedly suppressed evidence was the fact that the kidnap victim in her first two reports to the police did not mention the specific sexual remarks made by appellant during her abduction and about which she testified before the grand jury. Appellant's remarks were crude and vulgar and it might well have embarrassed the victim to repeat them verbatim to the officers. Her reluctance to repeat appellant's gutter language does not tend to explain away the charge against appellant or raise an inference of his innocence of crime. Clearly, the prosecutor's omission to mention to the grand jury the victim's initial reluctance to repeat appellant's vulgarities did not amount to suppression of evidence, did not inject an element of unfairness or unreliability into the grand jury hearing that preceded indictment.

II

■ Respondent contends appellant should be returned to the trial court for resentencing under the newly adopted death penalty statute (Stats. 1977, ch. 316, No. 6 West's Cal. Legis. Service, p. 922, No. 2 Deering's Adv. Legis. Service, p. 1), effective 11 August 1977. Under the present statute, as under its predecessor, the victim's status as a peace officer provides ground for imposition of the death penalty (Pen. Code, § 190.2); but the new law purports to remedy the federal constitutional infirmities of mandatory death penalty, noted in *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909], and in *Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101], by making mitigating circumstances relevant to imposition of sentence. Respondent argues that under the recent United States Supreme Court case of *Dobbert* v. *Florida* (1977) 432 U.S. 282 [53 L.Ed.2d 344, 97 S.Ct. 2290] no ex post facto or other constitutional objection prevents imposition of the death penalty under the new statute to persons whose causes are presently pending on appeal.

In *Dobbert,* the defendant's crime was punishable by death at the time of its commission, but the statute authorizing the imposition of punishment was later ruled constitutionally infirm. By the time defendant came to trial, however, that statute had been replaced by a second statute which constitutionally imposed the death penalty. The Supreme Court found no constitutional impediment to application of the new sentencing procedure to defendant and upheld the imposition of the death penalty, because, although conceptually no valid death penalty statute had been in effect at the time defendant committed his crime, in point of fact the statute was on the books, defendant was on fair notice that his crime was punishable by death, and the subsequent procedural change in the statute made the procedure for imposition of the death penalty more advantageous and not more burdensome to the defendant. Procedural changes do not amount to ex post facto violations, said the court. Nor was there any denial of equal protection of the laws, for although other defendants tried and sentenced to death under the invalid law had had their sentences reduced to life imprisonment, Dobbert was in a different class from them because he had been tried and sentenced under the new law. *Dobbert* implies it would not be a violation of the federal constitutional prohibition against ex post facto law to try and sentence a defendant to death under a new death penalty statute for a crime committed during the existence of an earlier death penalty statute later found procedurally invalid under the federal constitution. The death penalty has been authorized in California since the adoption of a constitutional amendment in November 1972 (Cal. Const., art. I, § 27), which validated all death penalty statutes in existence in February 1972.[2] Under *Dobbert,* procedural changes in the administration of such laws could be retroactively applied; it follows that if a defendant committed his crime while a procedurally defective death penalty law was in effect but came to trial after the procedural defects had been corrected, he could be validly sentenced to death.

However, the facts in this case are not those of *Dobbert,* and the decisive issue is not that of ex post facto law. Appellant was tried and sentenced under a death penalty law whose procedures did not comport

---

[2]California Constitution, article I, section 27:

"All statutes of this state in effect on February 17, 1972, requiring, authorizing, imposing, or relating to the death penalty are in full force and effect, subject to legislative amendment or repeal by statute, initiative, or referendum.

"The death penalty provided for under those statutes shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments within the meaning of Article 1, Section 6 nor shall such punishment for such offenses be deemed to contravene any other provision of this constitution."

with the federal Constitution. Dobbert, on the other hand, was tried and sentenced under a death penalty law whose procedures fully complied with the federal Constitution. The crucial distinction is that appellant, unlike Dobbert, has already been sentenced to death under the earlier law. His life has been placed in jeopardy, and the decisive issue is whether a new sentence of death would amount to double jeopardy.[3]

The time sequence here is controlling. Appellant was tried and sentenced to death in June 1976 under the earlier death penalty law. In December 1976 *Rockwell* declared that only life imprisonment could be constitutionally imposed under that law. In practical effect that declaration automatically reduced appellant's sentence to life imprisonment as of December 1976. (Cf. *People* v. *Murphy* (1972) 8 Cal.3d 349, 352 [105 Cal.Rptr. 138, 503 P.2d 594].) When on appeal this court mechanically carries out the mandate of *Rockwell,* the prohibition against double jeopardy precludes any subsequent increase in punishment based on a new death penalty statute adopted in August 1977. Such an increase would be comparable to an increase in punishment on retrial, an increase foreclosed by *People* v. *Henderson* (1963) 60 Cal.2d 482, 497 [35 Cal.Rptr. 77, 386 P.2d 677],[4] as an impairment of the right to appeal. The instant appeal was automatic (Pen. Code, § 1239), and only by reason of its existence did it become technically possible for respondent to argue the applicability to appellant of the second death penalty statute. Had the cause become final and had appellant been awaiting execution on death row, there would be no question of resentence. We think *Henderson* proscribes any increase in appellant's present life sentence. Such an increase would indeed penalize appeal and put appellant in jeopardy of his life a second time. The double jeopardy clause was intended to prevent such occurrence, and in our view the existence of automatic appeal does not waive such protection. (Cf. *Green* v. *United*

---

[3] United States Constitution, Amendment V: ". . . nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb. . . ." California Constitution, article I, section 15: "Persons may not twice be put in jeopardy for the same offense. . . ."

[4] *People* v. *Henderson* holds that the protection of double jeopardy bars an increase in punishment after appeal and retrial, and that the right to appeal may not be conditioned on such unreasonable conditions as putting one's life at risk. (See *Gomez* v. *Superior Court* (1958) 50 Cal.2d 640 [328 P.2d 976]; *People* v. *Ali* (1967) 66 Cal.2d 277 [57 Cal.Rptr. 348, 424 P.2d 932]; *People* v. *Hood* (1969) 1 Cal.3d 444, 459 [82 Cal.Rptr. 618, 462 P.2d 370].) The United States Supreme Court agrees that an appellant cannot be convicted of a greater offense on retrial (*Green* v. *United States* (1957) 355 U.S. 184 [2 L.Ed.2d 199, 78 S.Ct. 221, 61 A.L.R.2d 1119]), but has held that under certain circumstances the *punishment* may be increased after retrial without violating the double jeopardy clause. (*North Carolina* v. *Pearce* (1969) 395 U.S. 711 [23 L.Ed.2d 656, 89 S.Ct. 2072]; *Chaffin* v. *Stynchcombe* (1973) 412 U.S. 17 [36 L.Ed.2d 714, 93 S.Ct. 1977].)

*States* (1957) 355 U.S. 184 [2 L.Ed.2d 199, 78 S.Ct. 221, 61 A.L.R.2d 1119].)

The case of *Ex Parte Lange* (1874) 85 U.S. (18 Wall.) 163 [21 L.Ed. 872], although quite different on its facts, is both analogous and instructive. Lange had been convicted of theft of mailbags and been sentenced to serve one year in prison and pay a fine of $200. However, the punishment specified by statute for his crime was imprisonment for one year *or* a fine up to $200. After Lange had promptly paid his fine, the trial court vacated its sentence and resentenced Lange to imprisonment for one year. On Lange's petition for habeas corpus he was ordered released on the ground he could not twice be placed in jeopardy for the same offense. The court pointed out that the essential danger inherent in double jeopardy lies in punishment even more than in prosecution and declared that the constitutional provision applies,

". . . to all cases where a second punishment is attempted to be inflicted for the same offence by a judicial sentence.

"For of what avail is the constitutional protection against more than one trial if there can be any number of sentences pronounced on the same verdict? Why is it that, having once been tried and found guilty, he can never be tried again for that offence? Manifestly it is not the danger or jeopardy of being a second time found guilty. It is the punishment that would legally follow the second conviction which is the real danger guarded against by the Constitution. But if, after judgment has been rendered on the conviction, and the sentence of that judgment executed on the criminal, he can be again sentenced on that conviction to another and different punishment, or to endure the same punishment a second time, is the constitutional restriction of any value? Is not its intent and its spirit in such a case as much violated as if a new trial had been had, and on a second conviction a second punishment inflicted?

"The argument seems to us irresistible, and we do not doubt that the Constitution was designed as much to prevent the criminal from being twice punished for the same offense as from being twice tried for it." (P. 173 [21 L.Ed. p. 878].)

The court's conclusion in *Lange* that petitioner could not be punished twice for the same offense is relevant to the present case. At bench appellant has been improperly sentenced to a more serious punishment, a punishment subsequently declared invalid on constitutional grounds.

Even though appellant's death sentence has not been executed, we think the argument irresistible that the prohibition against double jeopardy forecloses a further sentence in an attempt to reimpose the more serious punishment on him. (*United States* v. *Wilson* (1975) 420 U.S. 332, 343 [43 L.Ed.2d 232, 241, 95 S.Ct. 1013].) Were appellant remanded for resentence under the new law he would be entitled to plead a former judgment of conviction and sentence (Pen. Code, §§ 1016, 1023) and to assert that his cause, in the words of *Dobbert,* "had progressed sufficiently far in the legal process so as to be governed solely by the old statute, with the concomitant unconstitutionality of its death penalty provision. . ." (432 U.S. at p. 301 [53 L.Ed.2d. at p. 361]).